## Commonwealth vs. Jimmy Evans
### (and seven companion cases[1]).

Suffolk. January 10, 2003. - April 16, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Sosman, JJ.

*Constitutional Law,* Assistance of counsel. *Evidence,* Cross-examination, Bias, Past recollection recorded, Hearsay, Cumulative evidence, Impeachment of credibility, Prior inconsistent statement. *Witness,* Bias, Impeachment. *Grand Jury. Practice, Criminal,* Argument by prosecutor, Instructions to jury, Assistance of counsel, New trial, Costs, Capital case. *Homicide.*

At a criminal trial, there was no abuse of discretion in the judge's evidentiary ruling that criminal charges pending against a Commonwealth witness (including aggravated rape and kidnaping) were to be described as "serious felony charges" during cross-examination without naming the specific charges, where the defendants were able to explore adequately the question and extent of the witness's bias and motive to cooperate with the prosecution arising from the pending "serious felony charges" without referring to the specific charge. [188-189]

At a criminal trial, the judge erred in admitting in evidence the grand jury testimony of a Commonwealth witness as past recollection recorded, where the witness had no recollection of what he had told the grand jury and there was no evidence that he adopted the minutes of his grand jury testimony when his memory of events was fresh; further, in the absence of a finding of feigned memory loss, the witness's grand jury testimony was not admissible for substantive purposes under the rule established in *Commonwealth* v. *Sineiro,* 432 Mass. 735, 741 (2000); however, the erroneous admission of this hearsay evidence was not prejudicial, where the witness's grand jury testimony was merely cumulative of other testimony. [189-191]

At a criminal trial in which a Commonwealth witness denied making certain statements that were incorporated in the prosecutor's questions on direct examination, and there was no evidence that the witness ever made those statements, there was no error in the admission of testimony by a police officer that gave details that were essentially the same as those in the questions previously put to the witness by the prosecutor, where cross-examination of the witness, which provided evidence that was relevant to the issues on trial and helpful to the defense, also provided the proper basis needed by the prosecutor to impeach the witness with his prior inconsistent statement to the police officer. [191-192]

At a murder trial, the judge did not err in excluding the pretrial statement of a witness to the police that another person had admitted shooting the victim,

---

[1]Five against John Evans and two against Jimmy Evans.

where the witness, at a voir dire, repudiated his prior statement; where the prior statement to the police was hearsay, and the defendants failed to show that the hearsay fell within an exception to the hearsay rule; where the defendants failed to show that the witness's statement to police was inconsistent with any relevant testimony he would have given that would have permitted use of the statement to impeach him; and where the defendants failed to show that the statement to police was so reliable and trustworthy that, although hearsay, its exclusion might offend their constitutional right to present a defense; further, exclusion of the desired testimony could not have prejudiced the defendants. [192-193]

At a murder trial, the prosecutor's closing argument, in the context of the whole argument, did not constitute improper vouching [193-194]; improperly appeal to the sympathy of jurors where, in one instance, the judge's prompt, direct, and forceful curative instruction to the jury mitigated any substantial likelihood of a miscarriage of justice and, in another, the comment was brief and did not repeat or dwell on the potentially sympathetic material [194-195]; or improperly disparage a defense witness [195].

Defendants tried for murder in the first degree and other crimes were not denied the effective assistance of counsel by counsel's failing: to object to testimony of the victim's mother as marginally relevant, or as offered to evoke sympathy [195-196]; to object to testimony that was alleged not to be material to any issue in the case and therefore functionally equivalent to improper character evidence [196-197]; to move to sever the trial of indictments involving one defendant from the trial of indictments involving a second defendant so that the second defendant could have been tried first, acquitted, and made available to testify for the first defendant at his trial [197-198]; to file pretrial motions to dismiss an indictment alleging illegal discharge of a firearm based on the sufficiency of the evidence presented to the grand jury and to sever the trial on that indictment from the other indictments because the conduct supporting the two sets of indictments was unrelated, and by failing to file a motion for a required finding of not guilty based on the sufficiency of the evidence at trial [198-199]; to sever the indictment alleging illegal discharge of a firearm, thus creating spill-over prejudice in the form of prosecutorial misconduct [199-201]; or to investigate and develop forensic evidence [201-202].

On motion by criminal defendants for a new trial, there was no error in the judge's denial of requests for an evidentiary hearing, where one defendant failed to preserve a substantial issue, and no error in the judge's denial of the motions for a new trial, where the evidence presented was not newly discovered; further, to the extent that the motions also raised issues that had been raised in the defendants' direct appeals, the motions were correctly denied. [202-204]

At a murder trial, there was no abuse of discretion in a judge's denial of motions for funds to conduct forensic tests to support the defendants' claims of ineffective assistance of counsel, where the defendants failed to make the prima facie showing that the tests sought would have produced results that likely would have influenced the jury's conclusion. [204-205]

At a murder trial, there was no error created by the prosecutor's question to one defendant about his lack of concern for people at the scene of the killing, a sarcastic remark by the prosecutor about a defendant's inability to

recall the last names of certain friends, the judge's exclusion of a defendant's explanation for discarding his gun, or the judge's instructions on all three prongs of malice. [205]


INDICTMENTS found and returned in the Superior Court Department on February 21, 1997.

The cases were tried before *Robert W. Banks*, J., and postconviction motions were heard by *Elizabeth B. Donovan*, J.

*Michael R. Schneider* for Jimmy Evans.

*Emanuel Howard* for John Evans.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendants, brothers John Evans (John) and Jimmy Evans (Jimmy), were convicted of murder in the first degree on theories of extreme atrocity or cruelty and of deliberate premeditation, and illegal possession of handguns (G. L. c. 269, § 10 [*a*]), and ammunition (G. L. c. 269, § 10 [*h*]). John was also convicted of assault by means of a dangerous weapon, discharging a firearm within 500 feet of a building (G. L. c. 269, § 12E), and a number of motor vehicle and weapons violations.[2] Both defendants filed motions for a new trial, and motions for funds for an investigator as to claims raised in their motions for a new trial. A judge in the Superior Court (not the trial judge) denied both postconviction motions without an evidentiary hearing. On appeal the defendants claim error in various evidentiary rulings, prosecutorial misconduct during closing argument and during the cross-examination of Jimmy, ineffective assistance of counsel, and error in the denial of their motions for a new trial and for postconviction funds to investigate. We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the convictions.

1. *Background.* The jury could have found the following facts. At about midnight on January 24, 1995, the victim, Lyle Jackson, went to Cortee's, a nightclub in the Dorchester

---

[2]The convictions of the motor vehicle violations and some of the weapons possession violations were placed on file and are not before the court on appeal.

neighborhood of Boston, where he met a friend, Marcello Holliday. The defendants were at the same nightclub with two friends, Robert Brown and Ronald Tinsley. At approximately 1:45 A.M. on January 25, the victim, Holliday, and another friend left to go to a nearby fast food restaurant, Walaikum's. As they were in their car preparing to leave, John ran past their car and fired a handgun three or four times at a group of people on the other side of the street.

The victim, Holliday, and their friend arrived at Walaikum's at approximately 2:20 A.M. The restaurant, which occupies a small space, was crowded with customers. About fifteen minutes later the defendants and their two companions entered the restaurant, looked around for about one minute or so, and walked out. Less than one minute later, they reentered. Tinsley talked with a girl standing behind Holliday, and the other three remained near the door. Brown said to the defendants, "That's one of them right there." Jimmy asked, "Is that him right there?" Brown said, "Yeah." Jimmy then produced a silver handgun with a black handle. John was standing right beside him. Jimmy walked toward the victim, who, seeing him approach with a gun drawn, began to back away. Holliday ran outside. The victim fell over some chairs and tables as he backed away, then crawled into a corner and begged Jimmy for his life. Jimmy shot at him four or five times.

Alton Clarke, a patron of the restaurant, tried to leave but was confronted by John, who was armed with a black handgun. Clarke was allowed to leave after he said he had nothing to do with the victim. John then approached the victim and fired a shot at him. Clarke heard the shot from just outside the restaurant and said it sounded different from the shots he heard when he was inside. Willy Wiggins, who owned Walaikum's, saw the first gunman shooting at the victim, then went to the back of the restaurant to telephone the police.

The defendants, Brown, and Tinsley fled the scene in a gold Lexus automobile. John drove, Jimmy sat in the front passenger seat, and the other two sat in the back. Police arrived and pursued them. At one point a marked police cruiser with its blue lights flashing was forced off the road to avoid a head-on collision with the Lexus. During the chase two guns were

thrown out of the front passenger window of the Lexus. The Lexus turned up a dead end street and stopped. The occupants were apprehended as they tried to flee on foot. The two guns thrown from the Lexus were recovered. One was a silver-plated nine millimeter Ruger semiautomatic handgun with a black handle. The other was a black nine millimeter Heckler & Koch semiautomatic handgun.

Ballistics evidence recovered from both inside and outside the restaurant included six shell casings (three from the Ruger, and three from the Heckler & Koch) and four bullet fragments (two from the Ruger and two from the Heckler & Koch, including a projectile removed from the victim's body). No identifiable fingerprints could be retrieved from either gun.

The victim died from an infection due to his wounds. He had been shot three times. One shot passed through his left forearm and into his ribs. Two shots entered the left side of his abdomen and passed through his body. A fourth was recovered from his body. The victim had no gunpowder residue on his clothes, indicating that he had been shot from a distance of at least three feet.

The four men were tried together on a theory of murder by joint venture. Both John and Jimmy testified, but neither Brown nor Tinsley testified. The jury found the defendants guilty, and acquitted Brown and Tinsley.

2. *Evidentiary rulings.*

(a) The defendants argue that their rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to cross-examine a Commonwealth witness, Alton Clarke, with evidence of bias was impermissibly limited by a ruling that charges pending against him in Suffolk County, including aggravated rape and kidnapping (*Commonwealth* v. *Clarke*, 48 Mass. App. Ct. 482 [2000]), be described as "serious felony charges" during cross-examination without naming the specific crimes.

Where there is some evidence of bias, a defendant has a constitutional right to cross-examine a prosecution witness to show bias, but "the judge has broad discretion to determine the scope and extent of cross-examination." *Commonwealth* v. *Jackson*, 431 Mass. 535, 538 (2000). Although "it would ordinarily

be helpful for the jurors to know the nature of the unresolved charges pending against a witness so that they will have some means of gauging the extent to which the witness may be biased[, m]uch must be left to the discretion of the trial judge in this area." *Commonwealth* v. *Lewis*, 12 Mass. App. Ct. 562, 573 n.20 (1981).

The defendants were able to explore adequately the question and extent of Clarke's bias and motive to cooperate with the prosecution arising from the pending "serious felony" charges without referring to the specific charge. Clarke testified emphatically that he was promised nothing and he expected nothing. Clarke in fact later went to trial and was convicted of aggravated rape and kidnapping. His convictions were reversed on appeal. See *Commonwealth* v. *Clarke, supra*. The defendants have failed to show how the limitation on cross-examination was an abuse of discretion.

(b) The Commonwealth called a witness, Marvette Neal, who testified that he knew the victim and the Evans brothers. He recalled seeing the victim at Cortee's on January 24, 1995, and later at Walaikum's. He could not remember whether he had seen the Evans brothers at either place that night or the next morning. Over objection, the judge permitted the prosecutor to introduce a portion of Neal's testimony before the grand jury as substantive evidence under the "past recollection recorded" exception to the hearsay rule. Neal had told the grand jury that he had seen the defendants inside Cortee's and inside Walaikum's on January 24 and 25.[3]

A writing may be admitted under the past recollection recorded exception to the hearsay rule if "(1) the witness has no revivable recollection of the subject, (2) the witness had firsthand knowledge of the facts recorded, (3) the witness can testify that the statement was truthful when made, and (4) the recording was made when the events were fresh in [his] memory." *Commonwealth* v. *Nolan*, 427 Mass. 541, 543 (1998). As to the fourth element of the foundation, where the recording was made by another, it must be shown that the witness adopted

---

[3]Neal testified that he could not recall his grand jury testimony. His grand jury testimony was admitted through the court reporter who had recorded the grand jury testimony.

the writing *"when the events were fresh in [the witness's] mind"* (emphasis in original). *Commonwealth* v. *Bookman,* 386 Mass. 657, 664 (1982). See *Commonwealth* v. *Fryar,* 414 Mass. 732, 746 (1993), *S.C.,* 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997); P.J. Liacos, M.S. Brodin & M. Avery, Massachusetts Evidence § 8.17 (7th ed. 1999 & Supp. 2003). Here, there was evidence to satisfy the first three elements, but not the fourth. Neal had no recollection of what he had told the grand jury and there was no evidence that he adopted the minutes of his grand jury testimony when his memory of events was fresh. *Commonwealth* v. *Fryar, supra.* It was error to admit Neal's grand jury testimony as past recollection recorded.

The Commonwealth alternatively contends that Neal's grand jury testimony was admissible for substantive purposes under the rule of *Commonwealth* v. *Sineiro,* 432 Mass. 735, 741 (2000), in which we extended the principle of *Commonwealth* v. *Daye,* 393 Mass. 55, 75 (1984) (under certain conditions, acknowledged prior testimony of witness before grand jury that is *inconsistent* with his trial testimony may be admitted for substantive use), to instances where a witness falsely asserts a lack of memory of the event and a lack of memory of his prior testimony. Before a witness's grand jury testimony may be admitted under the *Daye-Sineiro* rule, the judge must make a preliminary finding that the witness's claimed lack of memory has been fabricated. If that finding is made and is supported by the evidence, it is conclusive. See *Commonwealth* v. *Sineiro, supra* at 742-743 & n.6. Here, the judge did not make a finding that Neal's lack of memory was feigned. The single statement made by the judge on which the Commonwealth relies pertains to the judge's reason for giving the prosecutor some leeway in examining Neal about a conversation he had with two detectives a week before he gave his grand jury testimony. In the absence of a finding of feigned memory loss, Neal's grand jury testimony was not admissible under *Commonwealth* v. *Sineiro, supra.*

Where the erroneous admission of hearsay involving an identification of the defendant has been preserved for appellate review and the declarant testified at trial, we review its impact for prejudicial error. See *Commonwealth* v. *Martinez,* 431 Mass.

168, 176 & n.7 (2000). There was no prejudice. Both defendants testified and admitted that they had been at Cortee's. Jimmy also admitted that he had entered Walaikum's. Marcello Holliday saw John enter Walaikum's, and Alton Clarke said that the driver of the Lexus automobile — whom John admitted to be — had entered Walaikum's and shot the victim. Neal's grand jury testimony about the defendants' presence inside both establishments was merely cumulative of other testimony. See *id.* at 176.

(c) The prosecutor was permitted, over objection, to lay a foundation for his anticipated impeachment of Marvette Neal by prior inconsistent statement. Neal was asked during his direct examination if he had told police on February 10, 1995, that he had seen Jimmy walk into Walaikum's and stare at the victim; walk over to the entrance, where he ratcheted the slide of a silver automatic handgun; then approach the victim and fire approximately five shots at him. He was also asked whether he had told police that John entered Walaikum's and fired three or four shots at the victim after Jimmy shot him. Neal denied making those statements to police. The judge immediately instructed the jury that, where Neal denied making the statements incorporated in the prosecutor's questions, and where there was no evidence that Neal ever made those statements, there was no evidentiary value in the questions. See *Commonwealth* v. *Repoza*, 382 Mass. 119, 131 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987).

The next day the prosecutor called Detective Kenneth Dorch of the Boston police department, who testified that on February 10, 1995, Marvette Neal had told him that he saw both Jimmy and John shoot at the victim in Walaikum's. Dorch gave details that were essentially the same as those in the questions previously put to Neal by the prosecutor. The judge instructed the jury six times during Dorch's testimony that the evidence they just heard could not be considered for substantive purposes, but only for evaluating the credibility of Neal.

The defendants respond by arguing that the prosecutor had no legitimate basis to impeach Neal with a prior inconsistent statement. They contend that because Neal had given very little testimony that could be considered for substantive purposes,

and all of it favorable to the Commonwealth, the plan to impeach Neal with a prior inconsistent statement was nothing more than a "subterfuge to get before the jury evidence not otherwise admissible." *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 115 (1992), quoting *United States* v. *Morlang*, 531 F.2d 183, 190 (4th Cir. 1975). See *Commonwealth* v. *McAfee*, 430 Mass. 483, 490 (1999). They point to the fact that after Neal denied making the statement to police, the judge instructed the jury that there was no evidence of the statement before them. Consequently, nothing was in evidence at that time that would have justified the prosecutor's plan to impeach Neal with Dorch's testimony. At that juncture the only purpose of calling Dorch would have been to put before the jury Neal's hearsay statement to police under the guise of impeachment.

The argument has initial appeal, but it ignores one important fact. A proper basis for admitting Dorch's testimony did exist. Neal had been asked on cross-examination whether he ever saw John with a gun in his hand on January 24 or 25, to which he said he was sure that he had not. He was also asked on cross-examination if he ever saw Jimmy shoot anyone in Walaikum's, or if he saw Jimmy with a gun. Neal answered both questions in the negative. That cross-examination provided evidence that was relevant to the issues on trial and helpful to the defense, but it also provided the proper basis needed by the prosecutor to impeach Neal with his prior inconsistent statement to Dorch. See *Commonwealth* v. *Gil*, 393 Mass. 204, 219 (1984). There was no error in the admission of Dorch's testimony.

(d) The judge ruled that the defendants could not ask Eddie Hawkins, a potential defense witness, about his pretrial statement to police that Tinsley had admitted shooting the victim. The ruling came after a voir dire in which Hawkins repudiated his prior statement. He testified during voir dire that Tinsley had not told him that he shot the victim, and that he fabricated the statement he gave police with the hope of gaining favorable treatment in his own pending case. As a result of the ruling, Hawkins was never called to testify. The defendants claim that the ruling violated their constitutional right to present a defense, guaranteed by the Sixth Amendment and art. 12. See *Commonwealth* v. *Durning*, 406 Mass. 485, 494 (1990).

Hawkins's prior statement to police was hearsay, and the defendants have not shown that the hearsay fell within an exception to the hearsay rule. See *Commonwealth* v. *Semedo*, 422 Mass. 716, 727-728 (1996). The defendants also have not shown that Hawkins's statement to police was inconsistent with any relevant testimony he would have given that would have permitted them to use the statement to impeach him. From Hawkins's voir dire testimony the judge could properly conclude that, if called, Hawkins would offer no testimony relevant to any issue being tried, and therefore he could not be called solely for the purpose of being impeached by a prior inconsistent statement that was otherwise inadmissible. See *Commonwealth* v. *McAfee*, *supra* at 489-490. In addition, in light of Hawkins's testimony that the statement was not true and that he had made it up because he was motivated by self-interest, the defendants have not shown that Hawkins's statement to police was so reliable and trustworthy that, although hearsay, its exclusion might offend their constitutional right to present a defense. *Id.* at 491 n.3. There was no error in the exclusion of Hawkins's statement to police.

In any event, exclusion of the desired testimony could not have prejudiced the defendants. The Commonwealth proceeded against them at trial under the theory that they were joint venturers as well as principals. Tinsley's purported admission that he was one of the shooters was consistent with the Commonwealth's theory. Jimmy admitted in his testimony that he fired the Ruger; Holliday had testified that all four men appeared to be acting in concert inside the restaurant; and John admitted driving the getaway car.

3. *The prosecutor's closing argument.* The defendants argue that the prosecutor's closing argument was improper in three respects.

(a) The defendants contend that the prosecutor improperly vouched for the credibility of Alton Clarke by arguing that he (the prosecutor) had no deal with Clarke. Counsel objected at the conclusion of the prosecutor's argument.

Clarke had stated emphatically that he received no promises, and that he expected nothing for his testimony. The prosecutor's interjection of himself into Clarke's testimony by implying that

Clarke had no deal with him personally and by saying that Clarke was "expecting nothing from me" was unwise and unfortunate, but in the context of the whole argument, it did not constitute improper vouching. His comments were nothing more than a paraphrase of Clarke's testimony. See *Commonwealth* v. *Mitchell*, 428 Mass. 852, 857 (1999). The prosecutor's statement that he had "absolutely no interest in [Clarke's] criminal matter, because if I [the prosecutor] did, legally, you [the jury] would have found out about it," was not improper. It was "an accurate statement of the law and evidence." *Commonwealth* v. *Rise*, 50 Mass. App. Ct. 836, 845 (2001).

(b) The defendants argue that the prosecutor improperly appealed to the sympathy of jurors. The prosecutor referred to the arrival of the victim's mother at the scene as the victim was being placed in an ambulance, and that the victim began to cry when he saw her. The prosecutor then asked: "Should any mother have to see her own son [like] that?" The judge immediately interrupted the prosecutor and instructed the jury that "emotions have nothing to do with this. You must be very clinical. I refer you to alluding to the mother's feeling. I want you to disregard that." Counsel did not object and there was no request for a further instruction from the judge, an indication from experienced trial counsel that the judge's response was appropriate to mitigate any prejudice. See *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). The judge's prompt, direct, and forceful curative instruction mitigated any substantial likelihood of a miscarriage of justice.[4] Contrary to the defendants' claim that the judge's instruction was "bland" and "perfunctory," it was precisely what was required, and the fact that the judge interrupted the prosecutor's argument, sua sponte, must have impressed the jury that the prosecutor's comment had been rebuked with the most serious disapproval.

The defendants also argue that the prosecutor improperly appealed to juror sympathy when he argued that the victim left a

---

[4]There is no merit to the argument that the judge who heard the motions for a new trial resurrected this issue for full appellate review. She considered only whether the argument created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Oliveira*, 431 Mass. 609, 612 (2000), *S.C.*, 438 Mass. 325 (2002).

five year old child. The Commonwealth may properly "tell the jury something of the person whose life [has] been lost in order to humanize the proceedings." *Commonwealth* v. *Degro*, 432 Mass. 319, 323 (2000), quoting *Commonwealth* v. *Santiago*, 425 Mass. 491, 495 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). The prosecutor's comment was brief and he did not repeat or dwell on the potentially sympathetic material. Contrast *Commonwealth* v. *Santiago, supra* at 494 (prosecutor repeated twelve times that victim was pregnant and had been murdered day before her eighteenth birthday). The comment was not improper.

(c) There is no merit to John's claim that the prosecutor improperly disparaged a defense witness, Willie Wiggins, and that the prosecutor implied that he (the prosecutor) had a supervisory role over defense counsel's selection of witnesses. The prosecutor merely commented on the failure of the witness to testify as predicted in defense counsel's opening statement, something he was entitled to do. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 149-154 (1999).

4. *Assistance of counsel.* John claims that he was denied the effective assistance of counsel in several respects. Both defendants argue that their respective counsel were ineffective because they failed to investigate and develop forensic evidence to assist in their defense.

(a) John's first claim of ineffective assistance of counsel involves failure to object to testimony of the victim's mother, which, he argues, was marginally relevant and "appears to be more related to evoking sympathy [than] to proving the elements of the alleged crimes." *Commonwealth* v. *Santiago, supra* at 497, quoting *Commonwealth* v. *Gordon*, 422 Mass. 816, 830-831 (1996).

Under G. L. c. 278, § 33E, our review of claims of ineffective assistance of counsel is not limited to the adequacy of trial counsel's performance. We consider whether any "error in the course of the trial (by defense counsel, the prosecutor, or the judge) . . . was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We accord tactical decisions of trial counsel "due deference. Unless

such a decision was 'manifestly unreasonable when made,' we will not find ineffectiveness." (Citations omitted.) *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

The testimony of the victim's mother was brief, covering four pages of eleven volumes of trial transcripts. She identified a photograph of her son, testified that he was twenty-two years old at the time he died, that he had a five and one-half year old child, and three siblings. She testified that he started to cry when he looked at her as he was being placed in an ambulance. As previously discussed, Part 3 (b), *supra*, the prosecutor was entitled to "tell the jury something of the person whose life [has] been lost," *Commonwealth* v. *Degro*, *supra* at 323, and the victim's reaction to seeing his mother was relevant to show that he was close to her. The judge would have acted within his discretion had he admitted this testimony over objection. The prosecutor's development of her testimony was factual and he did not emphasize or exploit its emotional potential. Contrast *Commonwealth* v. *Santiago*, *supra* at 497. The defendant has failed to show error.

(b) John faults counsel for failing to object to the testimony of Gene Robbins, which informed the jury that, under the name Anthony Wilson, John leased the gold Lexus from Lexus of Norwood. The defendant claims that this evidence was not material to any issue in the case and therefore was the "functional equivalent" of improper character evidence. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). We disagree. The evidence was admissible to show John's control over the Lexus, which was relevant to the question of his identity as a participant in the murder. See *id.* Alton Clarke had identified the driver of the Lexus as one of the men wielding a gun. Officer Craig Jones identified John as the person who stepped out of the driver's door of the Lexus when it stopped after a lengthy high-speed chase. His willingness to drive the getaway car was relevant to the question of his participation as a joint venturer in the killing. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 351-352 (1991). If there had been an objection

to Robbins's testimony, there would have been no error in over-ruling the objection.[5]

As to the testimony that John had leased the Lexus under a different name, counsel had a strategic reason for not objecting. There had been testimony that John used the name Anthony D. Wilson at the time of his booking. Trial counsel immediately began to diffuse the potential for that evidence to be used as consciousness of guilt, see *Commonwealth* v. *Carrion*, 407 Mass. 263, 276 (1990), by planting a seed during his cross-examination of the booking officer. He suggested that John did not use the name Anthony Wilson to deceive police, but instead regularly used the name in his business and personal affairs. Later, during his cross-examination of Robbins, counsel elicited testimony that John had prior business dealings with Lexus of Norwood in which he used the name Anthony Wilson. He also elicited testimony from John that John had been using the name Anthony Wilson to reestablish his credit. His strategic use of Robbins's testimony was not unreasonable.

(c) There is no merit to John's claim that counsel should have moved to sever the trial of his indictments from those of Robert Brown so that Brown could have been tried first and acquitted, and then could have testified for him at John's trial.[6] There is nothing in the record to show that counsel knew or could have known before trial that Brown would have been tried first, that Brown would have been acquitted, or that Brown would have testified favorably for John if the cases had been severed. See *United States* v. *Drougas*, 748 F.2d 8, 19 (1st Cir.

[5]The prosecutor was not required to accept trial counsel's offer to stipulate that John leased the gold Lexus under the name Anthony Wilson. See *Commonwealth* v. *Nassar*, 351 Mass. 37, 46 (1966), *S.C.*, 354 Mass. 249 (1968), cert. denied, 393 U.S. 1039 (1969).

[6]Brown declined to file an affidavit but appellate counsel for John did file an affidavit in which he states that he spoke to Brown and his attorney. He indicates that Brown said he and John were outside Walaikum's during the shooting. He heard gunshots, then saw people running out and away from Walaikum's. He and John entered the Lexus. He asked John to drive away, but John would not leave without his brother. Ronald Tinsley and Jimmy then entered the Lexus and they all drove away. Counsel states that Brown told him that he would have testified to these facts at John's trial if he (Brown) had been tried first. The affidavit of counsel constitutes inadmissible hearsay as to Brown's assertions and need not be considered. See *Commonwealth* v. *Francis*, 432 Mass. 353, 372 (2000).

1984). Moreover, counsel could not have shown a bona fide need for Brown's testimony, because he expected that Willie Wiggins would testify that John was not inside Walaikum's, and it is likely that he knew Jimmy would testify, as he did, that John and Brown were outside Walaikum's during the shooting. See *id.* Had a motion to sever been presented, the judge would have acted within his discretion if he denied the motion. The defendant has failed to show that counsel had a basis to move for severance that would have outweighed the public interest in promoting the efficient administration of justice by joinder. See *Commonwealth* v. *Clarke*, 418 Mass. 207, 217 (1994).

(d) John asserts that counsel was ineffective in three respects pertaining to the indictment alleging illegal discharge of a firearm (G. L. c. 269, § 12E) during the earlier incident outside Cortee's. He claims that counsel should have filed (i) a pretrial motion to dismiss based on the sufficiency of the evidence presented to the grand jury, *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982); (ii) a pretrial motion to sever the trial of this indictment from the other indictments because the conduct supporting the two sets of indictments was unrelated, *Commonwealth* v. *Blow*, 362 Mass. 196, 200 (1972); and (iii) a motion for a required finding of not guilty based on the sufficiency of the evidence at trial, *Commonwealth* v. *Latimore*, 378 Mass. 671, 679-680 (1979).

Marcello Holliday testified before the grand jury that he saw John outside Cortee's at about 2 A.M. on January 25, 1995, and that John took a gun "out of his pocket," shot it "three to four times" at "members of the Castlegate Gang," then fled. Because John removed the gun from his pocket, the grand jury could have inferred that the barrel length was less than sixteen inches. See G. L. c. 140, § 121. See *Commonwealth* v. *Sylvester*, 35 Mass. App. Ct. 906, 907 (1993), and cases cited. The grand jury also reasonably could have inferred from this testimony that the defendant discharged a firearm within 500 feet of a building in use, without the permission of the owner or legal occupant. See G. L. c. 269, § 12E. A judge would not have erred by denying a motion to dismiss the indictment.

If counsel had moved to sever trial of the indictment alleging a violation of G. L. c. 269, § 12E, from trial of the other indict-

ments, there would have been no error in denying the motion. The incident outside Cortee's was relevant to show that John had access to a weapon consistent with one of the weapons used in the homicide shortly thereafter. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991). There is no requirement that the Commonwealth show that the weapon he possessed earlier actually was the murder weapon. *Id.* at 230 n.12. See *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). The evidence was also relevant to show that he knew that someone in his party was armed, undermining his claim to the contrary, and it was relevant to show that he played a deliberate role in hostilities shortly before the homicide. See *Commonwealth* v. *Stewart*, *supra* at 354. Severance would have served no purpose because the jury could have heard evidence of the earlier incident outside Cortee's. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 33 (1982). Joinder was warranted. *Id.*

A motion for a required finding of not guilty on the indictment alleging the § 12E violation would not have been meritorious, for reasons similar to those discussed with respect to the sufficiency of the evidence presented to the grand jury. Holliday's testimony at trial was substantially similar to his testimony before the grand jury about the incident. In addition, Officer Earl Perkins testified that he heard the shots, and went to Cortee's to investigate. Officer Richard Walker testified that shortly thereafter he saw a beige Lexus, similar to the Lexus driven by John after the shooting at Walaikum's, speeding away from Cortee's, from which the jury could have inferred that it was John fleeing. We are satisfied that the evidence met the standard set forth in *Commonwealth* v. *Latimore*, *supra*, to warrant denial of a motion for a required finding of not guilty.

(e) John claims spillover prejudice from the improper joinder of the indictment alleging the § 12E violation. Although we conclude that joinder was proper, we must address an evidentiary issue and an allegation of prosecutorial misconduct raised in his argument. The judge admitted, over John's objection, evidence that Officer Richard Walker was dispatched to the area around Cortee's to investigate a call about gunshots. He saw a Peugeot moving toward him at a high rate of speed, followed closely by a beige Lexus. He turned his cruiser around and fol-

lowed them. The Lexus had turned away in another direction. He eventually stopped the Peugeot. Its right rear window had been shattered. About forty-five minutes later he became involved in the chase of the Lexus leased by John, which appeared similar to the one he had seen behind the Peugeot. John contends that the prosecutor later improperly suggested in his closing argument that the beige Lexus was being driven by him, that he was chasing the Peugeot, and that he destroyed the rear window of the Peugeot with a gunshot.

The evidence concerning the Peugeot and the Lexus at Cortee's was admissible. The incidents at Cortee's and Walaikum's occurred within one mile of each other and about one-half hour apart. The Lexus driven by John as the getaway car after the shooting at Walaikum's was similar to the Lexus speeding away from Cortee's shortly after the shooting there. Evidence of John shooting a gun outside Cortee's was relevant. The inference that he was driving the Lexus that sped away from Cortee's was a fair inference, and the prosecutor's argument to that effect was fair. An inference need not be inescapable, just reasonable and possible. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 452 (1993). The reference to the Peugeot was merely background, being one of two speeding cars that Officer Walker saw but the only one he stopped.

We turn to the argument that the prosecutor improperly implied in his closing that John was chasing after the Peugeot and had destroyed the rear window with a gunshot. One week before his closing argument, during a sidebar conference in the middle of Walker's testimony, the prosecutor indicated that such evidence was forthcoming. However, it never materialized. In his closing, the prosecutor did not argue as the defendant suggests. He argued as follows: "Officer Walker began chasing the Peugeot right after those shots were fired. . . . He observed one of the windows shattered, and he just happened to see a Lexus following that Peugeot. Use your common sense. Draw the appropriate inferences. Do you think that Lexus is fleeing from Club Cortee's [*sic*] after the shooting? Use your common sense. I suggest there's evidence to suggest that. That's for you to determine, of course." The prosecutor did not imply that John had chased or shot out the window of the Peugeot, but that

he was "fleeing" from Cortee's, presumably before the police
could arrive. The inference he was asking the jury to draw was
different from what he had anticipated earlier in the trial, and it
was fairly grounded in the evidence.

(f) Both defendants contend that their counsel were ineffec-
tive for failing to investigate and develop forensic evidence. In
particular, they assert that counsel failed to arrange (i) bullet
trajectory, (ii) blood, and (iii) fingerprint tests. We conclude that
there was no reason for counsel to believe that any testing
would benefit the defense or that any hoped for results would
likely have influenced the jury's conclusion. See *Commonwealth*
v. *Wright*, 411 Mass. 678, 682 (1992).

(i) Jimmy argues that his counsel was ineffective for failing
to engage a ballistics expert to give bullet trajectory evidence.
Jimmy had testified that, after he had stepped outside Walai-
kum's, the Ruger discharged accidentally three times as it was
pointing downward. A bullet fragment fired from the Ruger was
found on a rug in the middle of the floor at Walaikum's. It had
blood on it, from which the jury could infer that it was one of
the bullets that passed through the victim's body. Contrary to
Jimmy's claim, there was no evidence that the bullet had been
moved. Because the victim had been lying down when he was
shot, it is not likely that a ballistics expert could have helped
the defense in any material respect.

(ii) If counsel had arranged to test the blood on Tinsley's
coat, and if the test results indicated that the blood was that of
the victim, the Commonwealth's case against the defendants
would not have deteriorated. The Commonwealth had proceeded
at trial on the basis that all four defendants were in close
proximity to the victim in the confined space of Walaikum's.
The prosecutor conceded twice at trial that the blood on Tins-
ley's coat could be the victim's, and he introduced evidence
that the blood type on Tinsley's coat was consistent with that of
both the victim and Tinsley. Thus, the blood evidence was not a
substantial part of the Commonwealth's case. See *Com-
monwealth* v. *Erdely*, 430 Mass. 149, 154 (1999). But, even if
Tinsley had shot the victim, that would not have helped Jimmy,
who admitted being the one who shot the Ruger from which a
bullet was fired that passed through the victim's body. Nor

would it have helped John under the Commonwealth's alternative joint venture theory. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 761-762 (2000) (where evidence established that defendant participated in joint venture to murder, jury need not determine precise role played); *Commonwealth* v. *Stewart, supra.* John had fired a gun about one-half hour before the victim was shot, and drove all the defendants from Walaikum's at high speed.

(iii) The failure to conduct fingerprint testing of the guns similarly would have produced nothing better for the defense. There is no reason to believe that the Commonwealth's fingerprint expert was wrong in concluding that there was insufficient fingerprint detail on either gun to make an identification. Nor is there reason to believe that he was wrong in concluding that in only about two per cent of cases do guns yield identifiable fingerprints, and in cases where prints can be identified, the age of the print cannot be determined. Thus, fingerprint evidence also was not a substantial part of the Commonwealth's case. See *Commonwealth* v. *Erdely, supra.* Even if fingerprint evidence could show that Tinsley had once touched the Heckler & Koch handgun, it would not prove that John had not also touched it. Given the Commonwealth's eyewitness testimony that John fired the Heckler & Koch, and Jimmy's admission that he fired the Ruger at Walaikum's, the Commonwealth's case against both John and Jimmy would not have been undermined. Moreover, as discussed, even if Tinsley had been one of the shooters, the evidence of joint venture was overwhelming.

We conclude that the defendants have failed to show that they were denied the effective assistance of counsel.

5. *Motions for a new trial.* The defendants filed motions for a new trial and for an evidentiary hearing on the motion. The newly discovered evidence is laid out in two affidavits. The first affidavit is that of John's appellate counsel, which states that Robert Brown, a codefendant who was acquitted, told counsel that Tinsley admitted three times that he shot the victim: once in the Lexus as they were fleeing from Walaikum's, once in court while they were waiting to be arraigned, and a third time at the Nashua Street jail. Brown also allegedly told counsel that he was outside Walaikum's with John during the shooting.

The second affidavit is that of Tasha Smith, who stated that she was outside Walaikum's talking with John at the time of the shooting.

"A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). "Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." *Id.* at 306. The newly discovered evidence "must also have been unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial)." *Id.* The judge may deny the motion summarily, without an evidentiary hearing, "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). See *Commonwealth* v. *Wolinski*, 431 Mass. 228, 237 (2000). The motion judge concluded that the evidence was not newly discovered and that the motion and supporting affidavits did not present a substantial issue requiring an evidentiary hearing. We agree.

John was aware of Tinsley's admission in the car as they fled Walaikum's because he testified about it. He also testified that he was outside Walaikum's at the time of the shooting talking with three friends, including Tasha Smith, although he did not know their last names. Consequently, the evidence in question is not "newly discovered." The defendants try to avoid the consequences of the rule by distinguishing the evidence as "newly available." They contend that Brown was not available because of his right not to testify under the Fifth Amendment to the United States Constitution, and Smith moved and could not be located until her affidavit was prepared. We recognize no such distinction, and treat them the same under the rule. See *Commonwealth* v. *Simmons*, 417 Mass. 60, 71 (1994).

Moreover, Brown's assertions, which were contained in an affidavit signed by appellate counsel, constitute inadmissible hearsay and need not be considered. *Commonwealth* v. *Francis*, 432 Mass. 353, 372 & n.16 (2000). See rule 30 (c) (3). Even if Brown had given an affidavit, "[t]he affidavit of . . . a

codefendant who did not testify 'is the weakest sort of evidence.' " *Commonwealth* v. *Grace*, 370 Mass. 746, 752 (1976), quoting *Dirring* v. *United States*, 353 F.2d 519, 520 (1st Cir. 1965). "[I]f a new trial could be predicated as of right upon a codefendant's change of heart after failure to take the stand there could always be a second chance for everyone." *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 386 (1987), quoting *Dirring* v. *United States, supra.*

Nothing in what Brown or Smith could have said would have helped Jimmy, especially where Brown told counsel that Tinsley passed his gun to Jimmy, who then threw both guns out of the car. As previously noted, Jimmy admitting having the Ruger in his hand when it was discharged, and the jury could have inferred that a bullet fired from Jimmy's gun, recovered from the middle of the floor at Walaikum's with blood on it, had been fired at the victim intentionally while Jimmy was inside the restaurant, not accidentally while he was outside. None of the "new" evidence could help him on that point.

Where the defendants failed to present a substantial issue, there was no error in the denial of the requests for an evidentiary hearing. Where the evidence was not newly discovered, the motions for a new trial were correctly denied. Finally, to the extent that the motions also raised issues that have been raised in the defendants' direct appeals, the motions were correctly denied.

6. *Motion for funds.* The defendants filed motions for funds to conduct forensic tests to support their claims of ineffective assistance of counsel, discussed in Part 4 (f), *supra.* Rule 30 (c) (5) of the Massachusetts Rules of Criminal Procedure, as appearing in 435 Mass. 1501 (2001), gives a judge "discretion to allow the defendant costs associated with the preparation and presentation of a motion [for a new trial]." The Reporter's Notes state that, "the court should consider a request for funds in conjunction with the appropriate discovery motion under subsection (c) (4) seeking access to the evidence in question." 43D Mass. Gen. Laws Ann., Rules of Criminal Procedure at 393 (West 2002). Under rule 30 (c) (4), a defendant is not entitled to access to the evidence in question unless he makes a prima facie showing that the test results would warrant a new

trial. See *Commonwealth* v. *Tague*, 434 Mass. 510, 519 (2001), cert. denied, 534 U.S. 1146 (2002).

The defendants have failed to make the prima facie showing that the tests now sought would have produced results that likely would have influenced the jury's conclusion. See Part 4 (f), *supra.*

7. *Miscellaneous issues.* Jimmy raises four additional issues that may be resolved summarily.

The prosecutor's question to Jimmy about his lack of concern for the people in Walaikum's was relevant to Jimmy's state of mind at the time of the shooting. See *Commonwealth* v. *Jenks,* 426 Mass. 582, 586 (1998).

The prosecutor's sarcastic remark about Jimmy's inability to recall the last names of friends was uncalled for and unprofessional, but the judge interrupted, told the prosecutor to refrain from making comments, and directed the jury to disregard the remark. The judge kept the trial under control and the transgression reflected more poorly on the prosecutor than it did on the defendant.

There is no merit to the claim that the judge improperly excluded Jimmy's explanation for discarding his gun. Jimmy did explain, and as he started to ramble, the prosecutor objected and counsel put a new question to him. There was no ruling, and no testimony was excluded.

Jimmy argues that the judge erred by instructing on all three prongs of malice. There was no objection. The error did not create a substantial likelihood of a miscarriage of justice because the instruction on deliberate premeditation was correct, and the evidence supports a verdict of deliberate premeditation. See *Commonwealth* v. *Jiles,* 428 Mass. 66, 72 (1998).

8. *General Laws c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the complete record. The defendants shot at the victim as he was lying on the floor, begging for his life. We see no reason to reduce the degree of guilt or order a new trial.

> *Judgments affirmed.*
>
> *Orders denying motions for a new trial and motions for costs affirmed.*