NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0678n.06
Filed: August 9, 2005

No. 03-6041

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JOHNNY KEYS,

     Defendant-Appellant.

_____/

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

BEFORE: COLE and CLAY, Circuit Judges; HOOD, District Judge.[*]

     **HOOD, District Judge.** Defendant Johnny Keys appeals from the November 26, 2002 order of the United States District Court for the Western District of Kentucky, denying Keys' motion to suppress evidence. Because we hold that the district judge clearly erred in denying the motion to suppress, we **REVERSE** the district court's order, **VACATE** Keys' conditional guilty plea and sentence, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.     Proceedings in the District Court

     On January 29, 2002, a federal grand jury from the Western District of Tennessee handed down an indictment charging Keys with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §

_____

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

922(k).

On April 24, 2002, Keys filed a motion to suppress evidence. A magistrate judge conducted an evidentiary hearing in connection with Keys' motion, and recommended that the district judge grant the motion to suppress. After timely filed objections by the United States, the district judge conducted an evidentiary hearing of her own. The district court denied Keys' motion on November 26, 2002, and Keys entered a conditional guilty plea.

On May 21, 2003, the district court conducted a sentencing hearing during which the judge suspended the imposition of sentence until Keys appeared for the conclusion of the sentencing hearing, scheduled for May 23, 2003. Keys did not appear as scheduled, and the district court issued a warrant for his arrest. Nearly two months later, on July 18, 2003, Keys was arrested. Keys was again brought before the district judge, who sentenced Keys to 105 months imprisonment to be followed by three years of supervised release.

**B.    Substantive facts**

On September 13, 2001, Memphis police officer Todd Ledgerwood observed a green Chevrolet Malibu driving slowly in a residential neighborhood. After seeing the car come to a stop, Ledgerwood observed Keys exit the vehicle and attempt to enter a duplex by first trying to open the door, then, upon finding the door locked, banging on the door and shouting for someone to let him in. Ledgerwood left his marked squad car and called out to Keys. Keys initially walked towards Ledgerwood, but hesitated. Ledgerwood heard what he described as a clattering noise, sounding like something metallic striking the concrete beneath Keys' feet. Looking in that direction, Ledgerwood saw a silver gun near Keys. Keys then took flight, with Ledgerwood giving chase,

leaving the gun where it lay. Keys was apprehended after running nearly three blocks away from the door of the duplex. Both Ledgerwood and Keys then returned to the scene where the gun was left behind.

Upon returning, the gun could not be found where it had been originally dropped. A witness indicated that someone called "grandma" had come out of the duplex Keys had sought entry to and retrieved the weapon. Ledgerwood proceeded to knock on the door, which was answered by an elderly man. Ledgerwood asked for "grandma," and a female later identified as Keys' grandmother, Mollie Keys, then came to the door. Ledgerwood asked if she had in fact taken the gun from outside. Ledgerwood claimed she indicated the gun was in the freezer, whereupon the officer retrieved the weapon and promptly left the duplex.

When questioned as to why he entered the home, Ledgerwood gave the following testimony:

> One, because I had a belief that the evidence had been removed from my crime scene and, two I was really - I was nervous about where that gun would end up. I mean I didn't want any kids getting shot or possibly that weapon falling into the wrong hands. You know, it's evidence and - it's not just evidence, it's very dangerous evidence.

Upon inspection, Ledgerwood discovered the gun was in fact loaded. He also discovered that the gun's serial number had been removed. A subsequent background check of Keys' record showed that he was previously convicted of a felony. Ledgerwood estimated he had been inside the home for around three minutes. On cross-examination, Ledgerwood told the court "grandma" told him the gun was "[i]n the kitchen, it's in the kitchen." The officer indicated he heard "grandma" make this statement as clearly as he could hear defense counsel's voice in court. Following Ledgerwood's testimony, defense counsel called Mollie Keys as a witness. Defense counsel informed the court and

government counsel that Mollie Keys' larynx was removed in 1979 due to throat cancer, a fact previously unknown by the government. The court permitted Mollie Keys to write down her responses to counsels' questioning. Through her writing, Mollie Keys testified to the following facts: Johnny Keys stays with her in her home, he has clothes in the home, and he possesses keys to the door. Mollie Keys also testified that Ledgerwood told her to give up the weapon or she would go to jail. She stated the officer entered the home without her permission and retrieved the gun himself. Mollie Keys' testimony does not detail how Ledgerwood knew where to look for the weapon, as she did not allege that he spent more than a few minutes in the home. Mollie Keys did admit she had indicated her possession of the weapon prior to Ledgerwood's entry into the duplex. However, she denied having gone outside to retrieve it. Instead, Mollie Keys stated she normally kept the loaded firearm in her freezer.

The district judge denied the motion to suppress, finding that although the evidence presented by the government did not support the consent of Mollie Keys to Ledgerwood's warrantless entry of the duplex, Ledgerwood's actions were nonetheless constitutional due to the presence of exigent circumstances. The district court specifically held Mollie Keys was unable to speak due to her throat condition, but that "she communicates fairly easily by gesture and mouthing words." The court below also recognized the disparity this fact created between the testimony of Ledgerwood and the testimony of Mollie Keys. Resolving the discrepancies in their testimony was not necessary in the district court's view, as "[u]nder either version of the events, Ms. Keys did not consent to the search."

Nonetheless, the district court denied the suppression motion based on the finding that

Ledgerwood reasonably believed loss or destruction of evidence was imminent. The district court noted Ledgerwood credibly testified that he entered the residence "because he was concerned about the removal of evidence and its dangerous nature." The court went on to deny the motion to suppress based on the removal of evidence claim. The court did not specifically address the asserted dangerous nature justification for making a warrantless entry. In its order, the court wrote as follows:

> The circumstances indicated a probability of deliberate removal of the weapon so that officers would not have access to it and thus represented a likely effort to assist Mr. Keys. Ledgerwood also had reason to believe that at least 'grandma' was in the house . . . .
>
> Before he knocked, Ledgerwood had a reasonable belief that loss or destruction of evidence was imminent. Here, the evidence subject to loss or destruction in the event of delay included possible fingerprints and ammunition as well as the gun. Moreover, contrary to the magistrate judge's suggestion, the only possible avenue for destroying evidence is not flushing it down a toilet. Heat, for example, could destroy a weapon's usefulness as evidence. Moreover, evidence can be concealed on occasion so that officers are unable to find it.
>
> Seizure of the weapon in this case was justified by exigent circumstances. Moreover, the intrusion into the home was limited in scope to the minimum necessary to prevent loss or destruction. As the government points out, securing the residence to obtain a search warrant and executing the warrant would have been far more intrusive that [sic] what in fact occurred."

Shortly after the denial of the motion to suppress, Keys pled guilty to Count 1 of the indictment, felon in possession of a firearm, preserving his right to challenge the suppression ruling on appeal.

## II. DISCUSSION

### A. Standard of Review

In reviewing the denial of a suppression motion, the district court's factual findings are reviewed for clear error. *See, e.g., United States v. Newton*, 389 F.3d 631, 635 (6th Cir. 2004) (citing *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003)). Conclusions of law are reviewed

*de novo. Id.*

**B.      Analysis**

The Fourth Amendment of the United States Constitution prohibits government actors from entering a home without a warrant supported by probable cause, subject to a few narrow exceptions. *See Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 639 (1980).  As the Supreme Court stated, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586.  In *Welsh v. Wisconsin*, the Court emphasized that "exceptions to the warrant requirement are 'few in number and carefully delineated.'" 466 U.S. 740, 749, 104 S. Ct. 2091, 80 L. Ed.2d 732 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 318, 92 S. Ct. 2125, 32 L. Ed.2d 752 (1972)).

One such exception is when exigent circumstances are found to exist.  As exigency is defined as "'a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984) (quoting *United States v. Flickenger*, 573 F.2d 1349, 1355 (9th Cir. 1978)); *accord United States v. Curzi*, 867 F.2d 36, 41 (1st Cir. 1989) (defining an exigency as when "there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant").  There are two requirements for a finding of exigent circumstances: (1) a reasonable belief that someone is inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent. *United States v. Radka*, 904 F.2d 357 (6th Cir. 1990); *see also, United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988) (finding exigent circumstances in warrantless entry when officers reasonably believed drugs were in building, someone was inside, and occupants may soon become

aware that police are after them). In order for exigent circumstances to justify a warrantless search, the situation must be one where real immediate and serious consequences will certainly occur if police officers postpone their action in order to obtain a search warrant. *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003). Exigent circumstances are to be narrowly construed when they are sought to be applied to residential premises. *United States v. Nelson*, 459 F.2d 884 (6th Cir. 1972). Since warrantless home entries are presumptively unreasonable, *Payton*, 445 U.S. at 586, "the burden is on the government to demonstrate exigent circumstances that oevercome the presumption of unreasonableness." *Welsh*, 466 U.S. at 750; *accord Morgan*, 743 F.2d at 1162.

This Circuit recently examined the exigency exception to the warrant requirement. *See United States v. Chambers*, 395 F.3d 563 (6th Cir. 2005). In affirming the granting of a motion to suppress evidence, *Chambers* held a warrantless entry into a home was not justified by exigent circumstances. The court considered a warrantless search of a trailer home and garage in a remote area of Tennessee, which yielded evidence of a methamphetamine laboratory. *Id.* at 565.

The court detailed the basic requirement for a warrantless search based on exigent circumstances to be held valid. "In order for a warrantless search to pass muster, probable cause must exist, but 'no amount of probable cause can justify a warrantless seizure,' because, in addition, the cause of the search must be based on an 'emergency' and hence, 'inadvertent' or unanticipated." *Id.* (internal citations omitted). *Chambers* went on to note that "[w]hen there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances." *Id.* The *Chambers* court held that in the situation before it, any exigent circumstance was the by-product of law enforcement officers' own conduct. *Id.* at 566. Although *Chambers* is not directly

on point here, it does provide important guidance for evaluating the instant matter.

It should come as no surprise that most of the cases where a finding of exigent circumstances has been upheld involved illegal drugs as the evidence in question. The fear is that once suspects in drug cases become aware of a police presence, they will immediately set about destroying the most relevant evidence: the drugs. *See, e.g., United States v. Smith*, 386 F.3d 753, 760 (6th Cir. 2004). A common, and very easily accomplished, method of destroying drug evidence is by flushing it down the toilet. *Smith* held there was "insufficient evidence in th[e] record to support a reasonable belief that the destruction of the large amount of cocaine involved in this case was imminent." *Id.* In reaching its conclusion, the *Smith* court expounded on the meaning of a "reasonable belief" in the context of finding exigent circumstances:

> The mere possibility or suspicion that a party is likely to dispose of evidence when faced with the execution of a search warrant is not sufficient to create an exigency. Nor is the generalized and often recognized fear that destruction of evidence is an inherent possibility during the execution of a warrant adequate grounds to find exigent circumstances, although this is more likely to be accepted when the drugs are in easily disposable quantities.

*Id.* (citing *United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996)).

There are three types of evidence presently at issue: the fingerprints on the gun, ammunition in the gun, and the gun itself. The district court found the fingerprints and ammunition were clearly in danger of loss or destruction, while the actual weapon could have been concealed or intentionally damaged. With respect to fingerprints, the nature of such evidence makes it very easily lost or destroyed.[1] However, Keys' fingerprints on the weapon are unlike cases involving blood alcohol

---

[1] It should also be noted that fingerprint evidence on firearms is generally not available. "Certain items, such as firearms, are not conducive to locating fingerprint evidence, and

8

levels, cited in support of Ledgerwood's search, where there may not be any other evidence of the defendant's guilt. The same is true of the ammunition as well. Indeed, possession of a firearm was the charge; finding the gun to be loaded is not a necessary element of the offense. Here the central piece of evidence is the gun itself, and the issue is the proper manner in which a law enforcement officer should go about obtaining such evidence.

Feared concealment of the firearm is not enough to evade the warrant requirement. *See, e.g., United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) ("Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency."; *United States v. Dawkins*, 17 F.3d 399, 406 (D.C. Cir. 1994) ("[W]e have never found exigency *solely* on the basis that police have information that firearms are located in a private home.") (emphasis in original). In this case, the extent of possible concealment was limited to the Keys household. Based on his knocking on the door and communicating with Mollie Keys, Ledgerwood determined the gun was in fact inside the home. Ledgerwood and his fellow officers on the scene could have posted officers at each entry and/or exit, thereby securing the premises until a search warrant had been obtained and executed. *See, e.g., Segura v. United States*, 468 U.S. 796, 810, 104 S. Ct. 3380, 82 L. Ed.2d 599 (1984); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001).

Nor can making a hypothetically less intrusive warrantless entry be a valid basis for evading the Fourth Amendment's warrant requirement. Such a belief, even in good faith, would enable

---

therefore, although firearms evidence is examined for prints, it is not unusual that identifiable prints are seldom found on firearms." 1 Adrienne C. Lynch, *Criminalistics*, § 6.3.3(b) (MCLE, Inc. 2004) (reprinted with permission from *Massachusetts Expert Witnesses* (Peter M. Lauriat, et al., eds., MCLE, Inc. 2002)) (citing *Commonwealth v. Evans*, 439 Mass. 184, 202 (2003)).

countless warrantless searches and seizures based on law enforcement's allegation that it saved the defendant or a third-party further intrusion or hassle.

Only the fear of destruction of evidence remains as a proper rationale for allowing a warrantless entry. As an example, the district court noted the possibility of using heat to destroy the gun in the Keys home. While heat may indeed *affect* the usefulness of the weapon as evidence, by obliterating the serial number for instance,[2] it is doubtful that a firearm could be *destroyed* while police secured the area and simply waited to obtain a valid search warrant before entering the home. At oral argument, the Government admitted it was unlikely that the gun could have been destroyed in the time it would have taken Ledgerwood to get a valid search warrant. We agree with this assessment, and hold that a fear of destruction did not provide an exigent circumstance in this circumstance.

A risk of danger may also provide an exigent circumstance upon which to base a warrantless entry into a residence. *See, e.g., Williams*, 354 F.3d at 497. *Williams* held that a risk of danger exigency exception applies only in situations involving a need to protect or preserve life or to avoid serious injury to police officers or other individuals. *Id*. Cases approving a warrantless entry to seize a gun may involve exigent circumstances. *See, e.g., United States v. Johnson*, 106 Fed. Appx. 363 (6th Cir. 2004) (unpublished). In *Johnson*, the court held exigent circumstances justified police officers' warrantless entry into a residence to seize a shotgun. *Id*. There the officers were responding to a report of a man, the defendant, firing two shots into the air, reloading the gun, then

---

[2] As it was later discovered, the gun in question here already had an obliterated serial number.

running inside the house. *Id*. The house into which the defendant fled was located in a residential neighborhood where children resided. *Id*. On this basis, *Johnson* held there was ample justification for fearing for the safety of the officers and individuals both inside and outside of the home. *Id*.

This case lacks the risk of danger elements found in *Johnson*. Although Ledgerwood indicated he was "nervous about where that gun would end up," the district court did not base its decision on a risk of danger exigency. Other than Ledgerwood's assertion, there is not enough in the record to support denial of Keys' motion to suppress on a risk of danger basis.

### III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order, **VACATE** Keys' conditional guilty plea and sentence, and **REMAND** the case for further proceedings consistent with this opinion.