COMMONWEALTH *vs.* JOHN A. DURNING, JR.

Bristol. October 3, 1989. - January 18, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Due Process of Law*, Blood alcohol test. *Evidence*, Breathalyzer test. *Motor Vehicle*, Operating under the influence. *Practice, Criminal*, Disclosure of defense witnesses, Instructions to jury.

At the trial of an indictment for motor vehicle homicide while operating under the influence of intoxicating liquor, the record reflected the required preliminary finding by the judge that the Commonwealth had sustained its burden of showing that the result of a breathalyzer test, administered to the defendant by police, was sufficiently reliable to be considered by the jury. [490-492]

At the trial of an indictment for motor vehicle homicide while operating under the influence of intoxicating liquor, the defendant's due process rights were not violated by the admission in evidence of a breathalyzer test administered to him by police, although the police did not verify the test's accuracy by conducting a second breath test or a simulator test, where there was other evidence of accuracy and where the defendant was provided ample opportunity to exercise his statutory right to obtain an independent blood test. [492-494]

At a criminal trial the defendant's due process rights were not violated by the judge's refusal to grant him permission to call a prospective witness not listed on the pretrial conference report, where the decision to call the witness arguably surprised the prosecution and where the proposed testimony either was cumulative of other evidence or involved an issue collateral to those presented in the case. [494-498]

At the trial of an indictment for motor vehicle homicide while operating under the influence of intoxicating liquor, the judge's charge in its entirety, including his correct instruction to the jury that the Commonwealth must prove that the defendant's consumption of alcohol diminished his capacity to operate a motor vehicle safely, served to resolve any confusion created by the judge's statement that the defendant's "mental or physical faculties" need not be impaired. [498-499]

At a criminal trial the judge's instructions concerning the voluntariness of the defendant's pretrial admissions did not unfairly invite the jury to give his trial testimony special scrutiny. [499-500]

INDICTMENT found and returned in the Superior Court Department on July 14, 1987.

The case was tried before *Robert S. Prince*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Andrew Silverman*, Committee for Public Counsel Services, for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, John A. Durning, Jr., appeals from his conviction of motor vehicle homicide while operating under the influence of intoxicating liquor. The defendant claims error in the admission in evidence of the result of a blood alcohol test administered to him by the police. The defendant also challenges the trial judge's decision not to allow the defense to call a witness who was not listed on the pretrial conference report, and claims that a portion of the trial's judge's instructions to the jury was improper. For the reasons stated, we affirm the defendant's conviction.

We summarize the facts on which the jury could have based their verdict. At approximately 5 P.M. on Sunday, June 14, 1987, Dennis McMasters was operating his motor vehicle, proceeding east on West Main Street in Norton. Passengers in the pick-up truck were his wife, Linda McMasters, and their three children. As the McMasterses' vehicle proceeded, Dennis McMasters saw a maroon Pontiac Grand Prix automobile approaching, at an angle, from a parking lot on the north side of West Main Street. The Grand Prix, operated by the defendant, struck the McMasterses' pick-up truck, tipping it over. Linda McMasters was killed in the collision. Immediately after the accident, the defendant left the area, but returned to the scene three or four minutes later.

Norton police officer William Casassa arrived at the scene of the accident at some time between 6 and 6:16 P.M. He spoke with the defendant. Officer Casassa detected a strong odor of alcohol about the defendant, and observed that the defendant's eyes were glassy and bloodshot. Officer Casassa also noted that the defendant's speech was thick, slurred, and

deliberate, and that the defendant was weaving and unstable on his feet. The defendant admitted to having four or five beers earlier in the day at a local tavern, and to driving at forty-five to fifty miles per hour just prior to the accident. There was testimony that the speed limit on West Main Street was forty miles an hour. Officer Casassa found an empty cooler and three empty beer cans on the floor of the defendant's automobile.

Detective Stanley Walasavage of the Norton police department arrived at the scene of the accident, and he also observed that the defendant was unsteady and smelled of alcohol. Officer Walasavage and Officer Casassa administered two field sobriety tests to the defendant, in which he was asked to close his eyes and place his fingertip on the tip of his nose, and to recite the alphabet. The defendant was able to place his finger on his nostril, but appeared unsteady while performing the test. The defendant recited the alphabet, but in a slow, slurred, and deliberate manner. At this point, Officer Walasavage placed the defendant under arrest. The defendant then requested a breathalyzer examination.

At approximately 7:30 P.M., Officer Casassa brought the defendant to the Norton police station. On learning that the Norton police department's breathalyzer machine was being repaired, Officer Casassa took the defendant to the Mansfield police station, arriving at 8 P.M. Sergeant Figueredo of the Mansfield police department, a certified breathalyzer operator, interviewed the defendant, advised him of his rights, and performed the breathalyzer examination. The breathalyzer machine, known as the Intoxilyzer, Model 4011-AS (Intoxilyzer), registered a blood alcohol level of .11.[1] Sergeant Figueredo did not perform a second breath test or a simulator test.[2]

---

[1]Under G. L. c. 90, § 24 (1) (*e*),·if a person's blood alcohol level is determined to be .10 or greater, that person may be presumed to be under the influence of intoxicating liquor.

[2]During a simulator test, a solution containing .15 per cent alcohol is passed through the test machine. If the machine registers an alcohol content greater than .16 per cent or less than .14, the machine is considered

Officer Casassa then brought the defendant back to the Norton police department, where the defendant made fifteen to twenty phone calls in an unsuccessful attempt to obtain a physician to administer a second blood alcohol test, pursuant to his rights under G. L. c. 263, § 5A.[3] The police did not offer to take the defendant to a hospital where he could have a blood sample taken.

At trial,[4] Sergeant Figueredo testified that he had been certified as a breathalyzer operator under a training program conducted by the Massachusetts State police. Despite repeated questioning during cross-examination regarding the contents of the training program and the number of breath tests he had been instructed to administer, Figueredo testified that the training program required only one breath test for incidents prior to July 1, 1987. He added that two breath tests and a simulator test were required only as of July 1, 1987, pursuant to G. L. c. 90, § 24K. Sergeant Figueredo stated that he performed a simulator test on the Intoxilyzer approximately every two weeks in order to check the machine's accuracy. The machine used to test the defendant's breath on June 14, 1987, underwent a simulator test on May 26, 1987, and again on June 27, 1987. In addition, another

---

unreliable and should not be used to test a driving under the influence suspect until repairs are made.

[3]General Laws c. 263, § 5A (1988 ed.), states: "A person held in custody at a police station or other place of detention, charged with operating a motor vehicle while under the influence of intoxicating liquor, shall have the right, at his request and at his expense, to be examined immediately by a physician selected by him. The police official in charge of such station or place of detention, or his designee, shall inform him of such right immediately upon being booked, and shall afford him a reasonable opportunity to exercise it."

[4]Prior to trial, defense counsel filed a motion in limine to exclude the result of the breath test as scientifically unreliable. After argument and consideration, the judge denied the motion and denied the defendant's request to hear the defendant's expert witness regarding the reliability of the breath test.

At trial, defense counsel objected to the introduction in evidence of the breath test result and again requested a hearing on the issue of its admissibility. The judge overruled the objection and denied the request.

accuracy test, known as a beam attenuator check, was conducted on the Intoxilyzer on June 19, 1987, and the machine was tested and certified for use after July 1, 1987, by the Department of Public Safety's office of alcohol testing on June 3, 1987.

The defense called Patrick Demers as an expert witness. Demers testified before the jury that a blood alcohol examination which did not include at least two breath tests and a simulator test was scientifically unreliable. He admitted, however, that no State regulation in force at the time required two tests. Later, the defendant sought permission of the court to present the testimony of Sergeant William Mann of the Massachusetts State police, who had been Sergeant Figueredo's instructor during breathalyzer certification training. Sergeant Mann was prepared to testify that, contrary to Sergeant Figueredo's testimony, he had taught Figueredo that two breath tests and a simulator test should be performed during each examination. The judge denied permission to call Sergeant Mann on the ground that he was not listed as a witness on the pretrial conference report.

On April 13, 1988, the jury found the defendant guilty of motor vehicle homicide while operating under the influence of intoxicating liquor. The defendant was sentenced to serve a term of from nine to twelve years at the Massachusetts Correctional Institution, Cedar Junction.

1. *Admissibility of the breath test results.* The defendant proposes two grounds for error in the admission of the breath test results. He claims that the judge erred by failing to find explicitly that the Commonwealth had sustained its burden of showing that the breath test procedure used in this case was scientifically reliable. The defendant also charges that the admission of the single breath test result, without the benefit of a second breath test or a simulator test, violated his State and Federal due process rights to challenge the accuracy of evidence against him. We conclude that the judge made a preliminary finding of fact that the breath test evidence was sufficiently reliable to be admitted in evidence, and that the admission of the single breath test result did not

deprive the defendant of any of his due process rights. We address each of the defendant's claims regarding the breath test results.

a. *Preliminary findings on admissibility.* The Legislature and this court have recognized the reliability of the scientific principles underlying the use of breathalyzer evidence. G. L. c. 90, § 24 (1) (*e*). See *Commonwealth* v. *Neal*, 392 Mass. 1 (1984). "Where . . . evidence is presented that a scientific instrument previously considered reliable no longer has that status, the burden of proof reverts to the proponent to establish admissibility of a result obtained from the instrument." *Id.* at 20 n.20. The determination as to the admissibility of evidence is the responsibility of the judge and not the jury. *Id.* at 19. *Commonwealth* v. *Shea*, 356 Mass. 358, 361 (1969). However, if the judge makes a preliminary finding of fact that the scientific evidence is sufficiently reliable to be admitted, evidence attacking its reliability can be considered by the jury in determining the weight to be accorded the scientific evidence. *Id.* at 361. *Commonwealth* v. *Yameen*, 401 Mass. 331, 336 (1987), cert. denied, 486 U.S. 1008 (1988).

In the present case, the defendant does not challenge the general acceptance of the scientific principles underlying breath test analysis of blood alcohol content.[5] Instead, the defendant argues that the breath testing procedure utilized by Sergeant Figueredo, which did not include a second breath test or simulator test, produced a scientifically unreliable result because there were no comparative test results against which to gauge the Intoxilyzer's accuracy.

The defendant contends that the judge mistakenly concluded that the breath test result *must* go to the jury, and thereby failed to make the required preliminary finding of fact that the breath test result was sufficiently reliable to be considered by the jury. The defendant relies heavily upon

---

[5]"[S]cientific instruments that measure blood alcohol content on the basis of breath samples have for some time been deemed to satisfy this Commonwealth's 'general acceptance' standard for admissibility of scientific evidence." *Commonwealth* v. *Neal, supra* at 17.

certain language used by the judge in considering the defendant's motion.[6] This language does not support a conclusion that the judge failed to make a finding on admissibility of the breath test result.

Prior to stating that the evidence should go to the jury, the judge heard argument from defense counsel that the breath test result was scientifically unreliable according to existing case law and proposed expert testimony. The judge also reviewed relevant case law from other jurisdictions, and requested and heard an offer of proof by the Commonwealth regarding the reliability of the breath test result.[7] Responding to the Commonwealth's argument that no voir dire was required on the issue of admissibility, the judge stated "[n]o, the offer of proof certainly is the basis on which I would make a determination."

In light of the judge's actions in requesting an offer of proof regarding admissibility and examining relevant case law, and his recognition that he was to make a "determination" on the basis of the offer of proof, we conclude that the judge made a preliminary finding that the breath test evidence was admissible. See *Commonwealth* v. *Gomes*, 403 Mass. 258, 273 (1988). The defendant offers no explanation as to what "determination" the judge might have had in

---

[6]The defendant's brief cites the following statement: "No, the offer of proof certainly is the basis on which I would make a determination. I have no, and I permitted the offer of proof to be made, and I'll certainly permit counsel to be heard on that particular issue. But I think clearly on the basis of the case, I read the case, that while the simulator was a matter of evidence in that case, and apparently the Court agrees that it was, in effect they've said the Commonwealth did not adduce evidence that it was in good working order.

"In this case the offer of proof indicates that there's evidence for the jury as to whether or not it was, as opposed to expert evidence, which the defendant has available that it wasn't. *And that's clearly a jury issue.* And that's how I see it." (Emphasis added.)

[7]The Commonwealth stated that it would introduce evidence that the Intoxilyzer had undergone simulator testing both before and "several days" after the breath test was administered to the defendant. The Commonwealth also offered to prove that the Intoxilyzer had been taken to the office of alcohol testing during the week of June 3 for testing and certification.

mind other than a preliminary determination as to the admissibility of the breath test result, and we can discern none. The judge's comment, "[a]nd that's clearly a jury issue", merely referred to the jury's duty to weigh the admissible breath test evidence against the conflicting testimony of the defendant's expert.

b. *The right to challenge the accuracy of the breath test result.* The defendant argues that the breath test procedure in this case fails under the due process analysis of *Commonwealth* v. *Neal*, 392 Mass. 1 (1984), because the failure to conduct a second breath test or simulator test, combined with the defendant's inability to obtain an independent blood test, deprived him of the opportunity to challenge the single breath test result. Therefore, the defendant claims, the admission of the breath test result constituted reversible error. We disagree.

In *Commonwealth* v. *Neal, supra,* we considered a series of due process claims regarding the accuracy of breathalyzer test results. One of the claims was that a single test breathalyzer procedure was violative of the right to a fair trial. While we conceded that a two test system would be the "better practice," we upheld the single test procedure, stating that "[t]he routine performance of a simulator test after each breath test, and the statutory right to an independent test, provide safeguards against the conviction of a driving under the influence suspect on the basis of an inaccurate result." *Id.* at 22.

In *Neal*, a simulator test performed at the time of the single breath test provided evidence of accuracy, while the statutory right to an independent blood test allowed the defendant an opportunity to collect further evidence regarding accuracy. Similarly, in the present case, the simulator tests performed nineteen days before and thirteen days after the defendant's breath test, as well as the certification by the office of alcohol testing eleven days before and the beam attenuator test performed five days after the defendant's breath test provided evidence of accuracy. In addition, the defendant was provided ample opportunity to avail himself of

his statutory right to obtain an independent blood test in order to further verify the accuracy of the result.[8]

The defendant, however, claims that *Neal* requires that a simulator test be performed immediately after a breath test, to provide an adequate measure of the breathalyzer's accuracy at the time of the performance in question. A failure to follow the "better practice" does not violate the right to due process when the practice actually followed is sufficient.[9] *Commonwealth* v. *Neal, supra* at 22.

We refer to "the familiar rule that a state of things once proved to exist may generally be found to continue." *Galdston* v. *McCarthy*, 302 Mass. 36, 37 (1938). *Commonwealth* v. *DeArmas*, 397 Mass. 167, 173 (1986) (Liacos, J., concurring). In the present situation, not only had the accuracy of the machine been proved once, it had been proved four times,

---

[8]The fact that the defendant was unsuccessful in his efforts to obtain a physician to administer an independent blood test does not affect our decision. General Laws c. 263, § 5A (1988 ed.), provides a driving under the influence suspect with a right to an independent blood test, and requires the police to afford the suspect a "reasonable opportunity to exercise [this right]." This "reasonable opportunity" generally requires the police to inform the suspect of his rights and to allow him access to a telephone. *Commonwealth* v. *Alano*, 388 Mass. 871, 879 (1983). There is no duty on the police to ensure an independent examination. See *Commonwealth* v. *Lindner*, 395 Mass. 144 (1985). While we have recognized that the boundaries of a "reasonable opportunity" "may vary depending on the circumstances," *Commonwealth* v. *Alano, supra* at 879-880, the fact that the defendant was allowed to make fifteen to twenty telephone calls certainly demonstrates that he was allowed a "reasonable opportunity" to exercise his right. There is no evidence of any special circumstances which would require more active participation by the police. Compare *Commonwealth* v. *Andrade*, 389 Mass. 874 (1983) (police failure to communicate statutory blood test right under G. L. c. 263, § 5A), with *Commonwealth* v. *Marley*, 396 Mass. 433 (1985) (sufficient if police advice of right is given at time defendant booked).

[9]The Legislature has recognized that the performance of a second breath test is the better practice. General Laws c. 90, § 24K, provides that the results of a breath test shall not be considered valid unless two breath tests and a simulator test are performed. However, § 24K does not affect the outcome of this case, as its provisions did not become applicable until July 1, 1987. The enabling legislation for § 24K specifically stated that the statute shall not affect the validity of tests conducted before July 1, 1987. St. 1986, c. 620, §§ 17, 23.

within the space of one month.[10] The defendant presented no evidence to indicate that the Intoxilyzer was tampered with, or that its accuracy might otherwise have been altered during the period between the successful accuracy tests on June 3 and June 19. In these circumstances, the judge properly could conclude that it was for the jury to decide whether the Intoxilyzer had been operating accurately at the time of the defendant's breath test.[11]

2. *The right to call a witness.* The defendant claims that the judge's refusal to grant permission to call Sergeant Mann, a witness not listed on the pretrial conference report, violated the defendant's State and Federal due process rights to present a defense. Sergeant Mann was prepared to testify that, during Massachusetts State police breathalyzer training, he instructed Sergeant Figueredo to administer two breath tests and a simulator test during each examination of a driving under the influence suspect.

The right to present a defense to a criminal charge is secured by art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Sixth Amendment to the United States Constitution as applied to the States through the due process clause of the Fourteenth Amendment. *Commonwealth* v. *Chappee*, 397 Mass. 508, 517 (1986). In order

---

[10]The defendant's reliance on *Commonwealth* v. *Cochran*, 25 Mass. App. Ct. 260 (1988), is misplaced. In that case, the Appeals Court concluded that the testimony of the operator of a Smith & Wesson Breathalyzer, model 2000, "conceded that he would have rejected the test had he noticed [that the machine was not working properly]." *Id.* at 264. No such concession and no such evidence of improper function was present in this case. Rather, as set forth in the test, the evidence presented warranted a strong inference that the Intoxilyzer was functioning properly.

[11]The defendant also points to the two-hour delay between the time of the accident and the time the breath test was administered as supporting a conclusion that the single breath test result is scientifically unreliable. The defendant's expert testified that it was possible for a person's blood alcohol level to increase over a short period of time even though no additional alcohol was ingested during that time. We do not find this expert opinion so compelling as to require the exclusion of the breath test result. "[D]elays between an accident or time of arrest and the testing for blood alcohol content generally [go] to the weight of the evidence and not to its admissibility." *Commonwealth* v. *Marley*, 396 Mass. 433, 438 (1985).

to lend substance to this right, both art. 12 and the Sixth Amendment guarantee a criminal defendant the right to call witnesses to testify on his behalf. *Id.* at 516-518. *Taylor* v. *Illinois*, 484 U.S. 400, 409 (1988). However, the right to call witnesses is not absolute; in the face of "legitimate demands of the adversarial system," this right may be tempered according to the discretion of the trial judge. *Commonwealth* v. *Edgerly*, 372 Mass. 337, 343 (1977), quoting *United States* v. *Nobles*, 422 U.S. 225, 241 (1975). See *Commonwealth* v. *Blaikie*, 375 Mass. 601, 608 (1978). For example, a trial judge has the discretion to control the scope of the examination of witnesses, *United States* v. *Nobles*, *supra* at 241, and can exclude witnesses whose testimony is cumulative, repetitive, or confusing, *Hamling* v. *United States*, 418 U.S. 87, 127 (1974).

The pretrial conference report is a device designed to respond to "legitimate demands of the adversarial system," by which the prosecuting attorney and counsel for the defendant are required to attend a pretrial conference "to consider such matters as will promote a fair and expeditious disposition of the case," and to memorialize any agreements reached at the conference in a conference report, which is filed with the court. Mass. R. Crim. P. 11 (a) (1), 378 Mass. 862 (1979). Among the issues to be discussed at a pretrial conference are the nature of the defense, the setting of the trial date, and the availability of necessary witnesses. Mass. R. Crim. P. 11 (a) (1). A trial judge has the power to enforce agreements contained in a pretrial conference report, and can take remedial action to remedy a violation of these agreements. *Commonwealth* v. *Chappee*, *supra* at 517. *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 747 (1986). This remedial power has been held to allow the exclusion of witnesses not listed on a pretrial conference report, subject to a balancing of "the Commonwealth's interest in enforcing its procedural rules against the defendant's constitutional right to present evidence in his behalf." *Commonwealth* v. *Chappee*, *supra* at 517-518.

In *Commonwealth* v. *Chappee, supra*, we laid out the factors which must be taken into account in assessing such a balance. They include: (1) prevention of surprise; (2) evidence of bad faith in the violation of the conference report; (3) prejudice to the other party caused by the testimony; (4) the effectiveness of less severe sanctions; and (5) the materiality of the testimony to the outcome of the case.

In the present case, defense counsel's decision to call Sergeant Mann arguably surprised the prosecution. Defense counsel announced his interest in calling Mann as a witness one day before he would have had Mann testify, but at that time he expressed uncertainty as to Mann's availability. Defense counsel's definite intention to call Mann, and Mann's availability to testify, were revealed to the prosecutor on the last day of trial, only two to three hours before Mann's proposed testimony.[12] Additionally, the allowance of Sergeant Mann's testimony could be viewed as somewhat prejudicial to the prosecution's case, because the prosecutor would have had to conduct Mann's cross-examination on very short notice. But any such prejudicial effect would have been limited because Mann's proposed testimony dealt with the State police training program, a topic already introduced in evidence by the testimony of Sergeant Figueredo. The prosecutor had an opportunity to review the training program with

---

[12]In response to defense counsel's announcement that Mann would be arriving at the court house within two hours, prepared to testify, the prosecutor stated: "I object to Sergeant Mann testifying. Sergeant Mann wasn't indicated on any witness list. And Sergeant Mann is perhaps being called only to corroborate what the expert is going to say. *And I object to Sergeant Mann. He wasn't part of this case. And the first I hear about Sergeant Mann was yesterday afternoon.*" (Emphasis added.)

Furthermore, we note that defense counsel had reason to know of Mann prior to trial. Sergeant Mann is the co-author of the Department of Public Safety's "Infrared Breath Testing Operator's Manual," a document which was obtained by the defendant in pretrial discovery and referred to by the defendant's expert during a pretrial conference. During this same pretrial conference, defense counsel indicated that Mann's coauthor would affirm the unreliability of a single test procedure. Therefore, prior to trial, the defendant should have been aware of Mann, the manual, and the possible expert opinion of Mann's co-author.

Figueredo, and could be expected to have at least a modicum of familiarity with the particulars of the program. While the court clearly had the discretion to order less severe sanctions which might have been effective in alleviating any prejudice to the prosecution's case, such as allowing the prosecutor to interview Mann prior to his testimony (see *Chappee, supra* at 518), our consideration of the materiality of Mann's proposed testimony persuades us to uphold the judge's decision to exclude Mann's testimony.

The primary issues in this case concerned the defendant's sobriety at the time of the accident and the ability of the Intoxilyzer accurately to reflect that sobriety. The defendant offered Sergeant Mann's proposed testimony to impeach Sergeant Figueredo's credibility and his competence as a breath test operator. However, as the judge noted, Mann's instructions to Figueredo at the training program to administer two breath tests and a simulator test were cautionary instructions, and did not reflect a clear directive of the law. Mann's proposed testimony did not attack Figueredo's skill in performing the single breath test; instead, it faulted Figueredo for failing to perform another breath test and a simulator test. In this sense, Mann's proposed testimony mirrored the testimony of Demers, the defendant's expert, that the single test procedure was scientifically unreliable. A trial judge has the discretion to exclude cumulative evidence. *Commonwealth* v. *Blaikie, supra* at 608.

In so far as Mann's proposed testimony challenged Figueredo for his failure to follow cautionary training instructions, the testimony involved an issue collateral to those presented in the case. Evidence concerning Figueredo's recollection of the training program sheds little light on the issue whether the Intoxilyzer accurately measured the defendant's blood alcohol level. A trial judge may exclude evidence regarding collateral issues if the danger of confusion, unfair prejudice, or undue consumption of time outweighs the probative worth of the evidence offered. *Robitaille* v. *Netoco Community Theatre*, 305 Mass. 265, 267-268 (1940). *Commonwealth* v. *Sherry*, 386 Mass. 682, 693 (1982).

The defendant's right to call his own witnesses does not extend so far as to require a judge to allow the presentation of cumulative or collateral evidence in contravention of a pretrial conference report.[13] The judge's refusal to allow Mann to testify was a proper exercise of his discretionary powers and did not violate the defendant's rights to due process.

3. *The jury charge.* The defendant claims that the judge erroneously charged the jury regarding the element of operating a motor vehicle while under the influence of intoxicating liquor and the assessment of pretrial admissions made by the defendant. The defendant raised no objection at the time of the charge. Thus, we consider the claim of error to determine whether the charge was "so erroneous that it created a 'substantial risk of a miscarriage of justice.' " *Commonwealth* v. *Pickles*, 393 Mass. 775, 776 (1985), quoting *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). Based on our review of the charge as a whole, *id.* at 776, we conclude that the charge did not create a substantial risk of a miscarriage of justice.

The judge charged the jury regarding the element of operating a motor vehicle while under the influence of intoxicating liquor with language virtually identical to that reviewed by this court in *Commonwealth* v. *Tynes*, 400 Mass. 369 (1987).[14] In that case, we upheld the charge, basing our deci-

---

[13]We note that the defendant had the opportunity to utilize discovery procedures to determine the contents of Figueredo's proposed testimony prior to trial, thereby determining any desire for Sergeant Mann's testimony before the trial began. In this manner, the pretrial conference report could have been modified to include Sergeant Mann if the defendant thought his testimony might bolster the defense. There is no evidence to indicate that the defendant chose to exercise this option.

[14]However, the defendant points to the following passage in the jury charge: "Again, to be under the influence of intoxicating liquor, it is not necessary to be intoxicated. A person is under the influence of intoxicating liquor when he is affected by it to the extent that his judgment, alertness, and ability to respond promptly and effectively to unexpected emergencies is diminished because of the consumption of alcohol. *And this condition even may result if the mental or physical faculties are not impaired.* The purpose of this statute is to protect the public from drivers whose judg-

sion in part on the fact that the trial judge had correctly instructed the jury five times to determine whether intoxication had diminished the defendant's capacity to drive safely. *Id.* at 375. Similarly, in the present case, the judge correctly instructed the jury four times that the Commonwealth must prove that the defendant's consumption of alcohol diminished his capacity to operate a motor vehicle safely. See *Commonwealth* v. *Connolly*, 394 Mass. 169, 173 (1985). In addition, when completing the section of the charge dealing with the element of operating under the influence, the judge stated that "[t]he Commonwealth must prove beyond a reasonable doubt that the defendant's consumption of alcohol caused and affected the defendant's ability to operate a motor vehicle safely, or diminished his ability to operate a motor vehicle safely." This final instruction, in conjunction with the four other proper instructions, served to resolve, in accordance with the relevant law, any confusion created by the judge's statement that the defendant's "mental or physical faculties" need not be impaired. See *Commonwealth* v. *Stathopoulos*, 401 Mass. 453, 455 (1988). Viewed as a whole, this section of the charge did not create a substantial risk of a miscarriage of justice.

The defendant also claims that the judge's charge regarding the jury's assessment of the defendant's pretrial admissions improperly singled out the defendant's trial testimony for special scrutiny.[15] We disagree. When viewed as a whole, the charge reveals that the language at issue sought to in-

---

ment and alertness and ability to respond promptly and alertly to unexpected emergencies has been diminished by the consumption of alcohol." (Emphasis added.)

[15]The defendant points to the following language in the jury charge: "Now, *in addition to that,* I would say that *with reference to any statements made by the defendant, you should consider with caution the evidence of any statement by the defendant.* In weighing such evidence, you should consider whether the statement was made by the defendant, to whom it was made, *whether it was truthful,* whether it was accurately repeated or recorded, and whether the defendant understood what was said, and take circumstances under which the questioning or the statements were made, *and what led to the statements, the emotions of hope or fear that may have existed* and the difficulty of contradicting such a state-

struct the jury as to the Commonwealth's burden to prove beyond a reasonable doubt that the defendant's pretrial statements were voluntary. *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).

Just prior to the contested statement, the judge instructed the jury that the "prosecution has the heavy burden of proof to demonstrate that the defendant knowingly and intentionally waived his privilege against self-incrimination." Directly after the contested statement, the judge declared that the "Commonwealth must prove beyond a reasonable doubt that any statements made by the defendant, one, were actually made by the defendant, two, that it was accurately quoted, three, that it was a voluntary statement, and four, that it was the product of his free and rational intellect." The positioning of the contested language between these two statements directed the jurors to consider the pretrial statements in the context of the issue of voluntariness. As such, there was no error in the use of this language. We think that the possibility that a jury would consider the phrase an invitation to single out the defendant's trial testimony for unfair scrutiny is remote. *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 (1975). The language, therefore, does not present a substantial risk of a miscarriage of justice.

*Judgment affirmed.*

---

ment" (emphasis added). Taken in context, this language had no applicability to the defendant's trial testimony.