SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. ADRIAN HINDS

 
 Docket:
 SJC-13538
 
 
 Dates:
 May 8, 2024 – September 23, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Assault and Battery by Means of a Dangerous Weapon. Evidence, Relevancy and materiality, Intent, Disclosure of evidence, Expert opinion, Rebuttal, Surrebuttal. Practice, Criminal, Disclosure of evidence, Witness. Constitutional Law, Witness. Witness, Expert, Impeachment. Intent. Social Media.
 
 

             Indictments found and returned in the Superior Court Department on April 27, 2016.
            Following review by this court, 487 Mass. 212 (2021), the cases were tried before John S. Ferrara, J.
            After review by the Appeals Court, 103 Mass. App. Ct. 1103 (2023), the Supreme Judicial Court granted leave to obtain further appellate review.
Elaine Fronhofer for the defendant.
            Joseph G.A. Coliflores, Assistant District Attorney, for the Commonwealth.
            DEWAR, J.  A jury convicted the defendant, Adrian Hinds, of two counts of assault and battery by means of a dangerous weapon based on evidence that the defendant attacked two victims with a hammer.  At trial, the defendant admitted that he hit each of the two victims, Miranda Arthur-Smith and Nathaniel Cherniak, with a hammer, but claimed he was acting in self-defense.  After the defendant's testimony partly contradicted the victims' testimony regarding his prior relationship with them, the Commonwealth introduced in rebuttal, over the defendant's objection, one text message and two social media posts that the Commonwealth argued demonstrated the defendant's animosity toward the victims.  The defendant then sought to call an expert in surrebuttal to dispute the social media posts' authenticity.  The trial judge excluded the testimony because the defendant had not timely disclosed the expert as a potential witness.
            On appeal, the defendant challenges the admission of the text message and social media posts, arguing they were "greatly" more prejudicial than probative.  He also claims the exclusion of expert testimony regarding the authenticity of these posts violated his constitutional right to present a defense.  We discern no error.  Appropriately applying the admissibility standard applicable to evidence of a defendant's prior bad acts, the trial judge did not abuse his discretion in concluding that the text message and social media posts were probative of the defendant's animus toward the victims and thus relevant to both the element of intent and the defendant's claim of self-defense, and that the evidence's probative value was not outweighed by the risk of unfair prejudice to the defendant.  Nor did the judge abuse his discretion or violate the defendant's constitutional right to present a defense in excluding the proposed expert testimony.  We therefore affirm.
            1.  Background.  a.  The Commonwealth's case.  We summarize the trial evidence as the jury could have found it, reserving certain details for later discussion.
            The defendant and the two victims lived in the same apartment building in Westfield.  The defendant's apartment, shared with his mother, was located at the garden level, and the victims' apartment was one floor above.
            The defendant and Cherniak were initially friendly with one another.  Around September of 2015, their relationship deteriorated after the defendant accused Cherniak of being an undercover Drug Enforcement Administration agent, a member of a cartel, and part of the Russian mafia.  The comments scared Cherniak, who stopped speaking to the defendant and bought pepper spray to protect himself.  Later, on another day, when the victims were returning to their apartment, they heard the defendant say to his mother, "Maybe they did it," or "They did it," while pointing at them.
            A few days before the incident in question, Cherniak observed the defendant standing in the apartment building's hallway with a hammer behind his back.  The defendant made a comment to Cherniak -- who described himself as Chinese and Polish and was raised by Jewish adoptive parents -- about the "president" putting Cherniak's "people in concentration camps."
            On March 23, 2016, as Arthur-Smith was leaving the apartment building, she heard someone run up the stairs behind her.  She was struck from behind on the head and shoulder, and pushed to the ground.  Once she was able to roll onto her back, she saw the defendant standing over her with a hammer.  The defendant began striking Arthur-Smith on the head with the hammer.
            Cherniak, having heard Arthur-Smith yelling, seized a decorative knife from their apartment, ran outside partially dressed, and saw the defendant with a hammer standing over Arthur-Smith, who was covered in blood.  Cherniak yelled at the defendant, who responded, "This is for messing with my mother."  Arthur-Smith then stood and chased after her dog that had escaped the building during the incident.  The defendant ran inside to his apartment.  Cherniak likewise briefly returned to his apartment, where he dressed and retrieved his pepper spray.  A maintenance worker for the building witnessed a portion of these events from the parking lot and then left to call the police.
            Shortly after Cherniak returned outside with his pepper spray, the defendant ran out of the building carrying a laptop and the hammer.  Believing the defendant was running at him, Cherniak sprayed the defendant with the pepper spray.  The defendant began hitting Cherniak with the hammer on his head, as well as on the hand that Cherniak was using to protect himself.  A neighbor saw the defendant hitting Cherniak with the hammer.
            The defendant then entered his car and drove away.  When police officers arrived five to ten minutes later, a detective observed blood on the pavement, on the building's door, and on the stairwell leading to the victims' apartment.  Later that day, the defendant's vehicle was found parked in a parking lot approximately ten miles away, with its passenger's side rear tire deflated.  The defendant was not inside the vehicle.  During a subsequent police search of the vehicle pursuant to a search warrant, a hammer was found.
            The following day, a State police trooper located the defendant at a family member's apartment in Springfield.  When he saw the trooper, the defendant stated, "I know why you're here.  They are terrorists.  They're being investigated by the [Federal Bureau of Investigation].  I did what I had to do."  The trooper did not observe any injuries on the defendant.
            b.  The defendant's case.  The defendant testified at trial that he was acting in self-defense.  He recounted a series of incidents in Westfield where racial epithets were shouted at him by strangers, bananas were left around his and his mother's vehicles, and their vehicles' tires were slashed.  Once when the defendant reported a tire slashing to the police, an officer examined the tire and told the defendant that he "shouldn't have big rims" because he would "get pinch-flats."
            The defendant's account of the deterioration of his initially friendly relationship with Cherniak differed from Cherniak's.  The defendant testified that his feelings toward Cherniak started to change after Cherniak mentioned his affiliation with a biker club in New York.  The defendant then distanced himself from Cherniak after an incident where Cherniak had asked the defendant to sell drugs with him.  When the defendant refused, stating "that's not my thing," Cherniak responded that the defendant "must be selling drugs" because he was a young Black man driving a Porsche.  At trial, the defendant called an expert witness to testify about the existence of a white supremacist group in New York called the 211 Boot Boys.  On cross-examination of Cherniak, the defendant attempted to elicit that Cherniak had a tattoo of the number "211," suggesting his membership in the group.[1]
            The defendant testified that, on the day of the incident, he was taking a shower when he heard the door to the apartment building close.  He left the shower and looked out his bedroom window to check his vehicle.  He saw Arthur-Smith and Cherniak standing next to his vehicle.  He then saw Cherniak kneel down, take a large knife from his waistband, and stab the vehicle's rear passenger's side tire.  The defendant then hastily dressed, grabbed a hammer, and left his apartment.  He encountered the victims in the building's hallway and confronted them about his tire.  According to the defendant, Arthur-Smith responded, "Even if you seen that, how the fuck could you prove it?"; blocked his path alongside Cherniak; and then sprayed him with pepper spray.[2]  The defendant testified that he then saw Cherniak take the large knife out of his waistband; felt the blade touch on his arm; and thought to himself, "I'm about to be killed.  I'm going to die."  He grabbed Cherniak and pulled him down the stairs.  Once Cherniak was behind him on the stairs, the defendant resumed walking up the stairs to exit the building.  Shielding his face from the pepper spray with his arm, the defendant swung the hammer "frantically back and forth" and felt it make contact with Arthur-Smith's body.  When the defendant reached the top of the stairs, he pushed Arthur-Smith outside through the door.  She fell backward, and he fell on top of her.  The defendant stood and saw Cherniak approaching with the knife.  As Cherniak attempted to slash the defendant with the knife, the defendant hit him with the hammer three or four times.
            The defendant further testified that, while he was able to return to his apartment, he did not feel safe staying there.  After collecting his wallet, keys, laptop, and hammer from his apartment, the defendant exited the building.  Cherniak, who was standing outside the building, sprayed the defendant with pepper spray.  The defendant stumbled and dropped the items he was carrying.  While continuing to be sprayed, the defendant reached down for the hammer, picked it up, and started swinging it at Cherniak, striking him about three or four times.  When Cherniak stopped spraying the defendant, the defendant picked up the rest of his items, entered his vehicle, and drove away.  When it became increasingly difficult to drive with the flat tire, the defendant parked his vehicle and then walked the couple of miles to his family's home in Springfield.  The defendant denied making the statement to the trooper who located him there regarding "terrorists" and that he "did what [he] had to do."
            c.  Procedural history.  The defendant was indicted on charges of armed assault with intent to murder, G. L. c. 265, § 18 (b) (two counts); assault and battery by means of a dangerous weapon causing serious bodily injury, G. L. c. 265, § 15A (c) (i) (two counts); assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); and cruelty to an animal, G. L. c. 272, § 77.  At his first trial, a jury found the defendant guilty of both counts of assault and battery by means of a dangerous weapon causing serious bodily injury and not guilty of the other offenses.  On appeal, we reversed the defendant's convictions and remanded the case for a new trial because the first trial judge had improperly excluded the defendant's proffered expert testimony regarding the 211 Boot Boys.  Commonwealth v. Hinds, 487 Mass. 212, 213, 217 (2021).
            On retrial, a jury found the defendant guilty of two counts of the lesser included offense of assault and battery by means of a dangerous weapon, one count each for Cherniak and Arthur-Smith.  He was sentenced to from eight to ten years in State prison on one count, with credit for time served, and to a consecutive five-year term of probation on the second count.
            The defendant appealed.  The Appeals Court reversed the judgments and set aside the jury's verdicts in an unpublished decision, concluding that the trial judge erred in admitting the two social media posts extracted from the defendant's cell phone and excluding expert testimony challenging the posts' authenticity.  Commonwealth v. Hinds, 103 Mass. App. Ct. 1103 (2023).  We allowed the Commonwealth's application for further appellate review.
            2.  Discussion.  a.  Admission of challenged evidence.  Before trial, the defendant filed a motion in limine to exclude items extracted from his cell phone, including one text message and two social media posts under the username "Adrian Anomaly Hinds."  The text message, preceding the incident by almost nine months and sent by the defendant to an unidentified third party, stated:  "Death to those in 65 miranda and nate will work work [sic] under false names they will die along with those who abuse their power and feed off suffering."  The first social media post, dated approximately six months before the incident, stated:  "[T]he half chink and Hispanic transgender punk (occupant of 66) as well as the brujeria store owner (occupant of 68) are getting scared all your loteria and san muerte and portugese bullshit witchcraft aint doing shit."  The second social media post, dated approximately four months before the incident, stated:  "[A]s soon as you leave the little meth head chink in 66 leaves."
            The trial judge initially agreed with the defendant that these statements should be excluded.  The judge acknowledged the statements were probative of the defendant's animus toward the victims but viewed them as "way too prejudicial."  The judge stated, however, that he would consider allowing the Commonwealth to introduce the statements in rebuttal if they "bear on [the defendant's] testimony or tend to impeach him."  The judge instructed the prosecutors not to make "reference to these extracted cell phone records" in the Commonwealth's opening statement.
            As discussed, the defendant testified on direct examination that he was acting in self-defense when he hit Cherniak and Arthur-Smith.  On cross-examination, the defendant acknowledged feeling "very angered" toward Cherniak "[a]fter [Cherniak] asked [the defendant] to sell drugs with him and made the racist comment, that [the defendant] must be selling drugs to afford [his] Porsche."  But the defendant denied that he had ever "said anything racial" to Cherniak and denied that he had "ever post[ed] anything negative about him."  The defendant also denied that the social media account "Adrian Anomaly Hinds" belonged to him.
            After the defense rested, the trial judge allowed the Commonwealth to recall a detective to testify about the extraction of the text message and social media posts from the defendant's cell phone.  The judge noted that, while the social media posts were "very prejudicial," they were "also very probative."  He concluded that, given the defendant's testimony, this evidence was "not more prejudicial than probative, because it [was] so probative."  Over objection, the detective read the text message and two social media posts into the record.  Later in the trial, the judge told counsel that he had admitted the text message and social media posts as evidence of the defendant's "state of mind at the time of [the] incident" because they were "suggestive of, at a minimum, animus."
            At the close of evidence, the defendant moved for a mistrial, arguing that the trial judge allowed the social media posts to be admitted based on an erroneous interpretation of the defendant's testimony.  The statements did not impeach his testimony, the defendant contended, because he had denied making racial comments to Cherniak, not racial comments about Cherniak.  The judge denied the defendant's motion for a mistrial, noting he was "sure" he did not admit the evidence "solely for impeachment purposes."
            i.  Impeachment versus rebuttal evidence.  As he did in his motion for a mistrial, the defendant argues that neither the text message nor the social media posts should have been admitted for impeachment purposes because the defendant had not denied making racial comments about Cherniak.  Notwithstanding the trial judge's comment at the outset of trial that he might admit this evidence for impeachment purposes, however, the record demonstrates that the judge ultimately admitted the evidence for its substance.  The judge did not instruct the jury that they could consider the evidence only insofar as relevant to the defendant's credibility.  And, later, the judge expressly stated that he had not admitted the evidence "solely for impeachment purposes," noting that the evidence bore on the defendant's "state of mind at the time of this incident."  The Commonwealth accordingly drew on the evidence in its closing as suggestive of the defendant's animus toward the victims.
            The text message and social media posts were thus admitted as substantive evidence in support of the prosecution's case on rebuttal.  Evidence in "[r]ebuttal is legitimate when it responds to the opponent's case," and, where otherwise admissible, the judge has "nearly" irreversible discretion to allow it.  Commonwealth v. Pagan, 440 Mass. 84, 89 (2003), quoting Commonwealth v. Roberts, 433 Mass. 45, 51 (2000).  We therefore review the evidence's admissibility for its substance.
            ii.  Prior bad act evidence.  The defendant contends that the text message and social media posts were evidence of prior bad acts that unfairly prejudiced him, including by suggesting a propensity to commit the charged crimes.  The text message contains a threat toward the victims, albeit sent to a third party, and the social media posts each refer to Cherniak using a racial epithet.  Evidence of prior bad acts "creates a risk that the jury will use [it] impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged."  Commonwealth v. Correia, 492 Mass. 220, 229 (2023), quoting Commonwealth v. Valentin, 474 Mass. 301, 308 (2016).
            Evidence of prior bad acts may, however, be used for "some other purpose, for instance, 'to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation.'"  Commonwealth v. Crayton, 470 Mass. 228, 249 (2014), quoting Commonwealth v. Walker, 460 Mass. 590, 613 (2011).  See Mass. G. Evid. § 404(b)(2) (2024).  Even when relevant for a permissible purpose, evidence of prior bad acts "is inadmissible where 'its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk.'"  Correia, 492 Mass. at 228-229, quoting Mass. G. Evid. § 404(b)(2).
            In reviewing a decision to admit evidence of prior bad acts, we consider "whether the trial judge carefully weighed the probative value and prejudicial effect of the evidence to be introduced," and "whether the judge mitigated the prejudicial effect through proper limiting instructions."  Commonwealth v. MacCormack, 491 Mass. 848, 863 (2023).  As relevant here, in assessing the potential prejudicial effect of this evidence, we also consider "whether the challenged evidence was cumulative of other properly admitted evidence, thereby reducing the risk of any additional prejudicial effect."  Id.  A trial judge's evidentiary ruling is owed "great deference" and will amount to an abuse of discretion only where we conclude that the judge "made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
            iii.  Analysis.  As the trial judge found, the text message and social media posts served permissible nonpropensity purposes:  to prove the defendant's intent and animus toward the victims and disprove the defendant's self-defense theory.  See Commonwealth v. Ford, 424 Mass. 709, 711 (1997) (for assault and battery by means of dangerous weapon, Commonwealth must prove defendant intended unjustified touching and touching was not accidental); Commonwealth v. Rodriguez, 370 Mass. 684, 687-688 (1976) (Commonwealth has burden to prove defendant not acting in self-defense, when defense properly raised).  With respect to the defendant's argument that this evidence should nevertheless have been excluded because it was "greatly" more prejudicial than probative, the text message and social media posts stand on overlapping but distinct footing.  We address their commonalities as well as considerations specific to the social media posts' racial epithets.
            Both the text message and the social media posts were probative of the defendant's animosity toward the victims.  The text message's statement -- "[d]eath to those in 65 miranda and nate . . . they will die . . ." -- tended to prove that the defendant harbored considerable animosity toward both victims and rebut the defendant's testimony that, while he had been angered by certain comments Cherniak had made in the past, he acted only in self-defense against Cherniak and Arthur-Smith.  See Commonwealth v. West, 487 Mass. 794, 806 (2021) (evidence of defendant's past "animosity or rage toward the victim" admissible to disprove accidental death defense).
            The social media posts were similarly probative.  The jury could have found that the posts' references to Cherniak using a racial epithet evinced hostility to Cherniak.  Moreover, the timing of the posts –- in September and November of 2015 -- lent credence to the victims' testimony that the defendant, starting in approximately September 2015, had made a series of strange and seemingly hostile remarks about them while in their presence.  The social media posts thus tended to corroborate the victims' testimony regarding the defendant's intent and animosity toward them; rebut the defendant's denials that his animosity extended to making the hostile remarks the victims described; and thereby rebut the defendant's testimony that the alleged victims were the first aggressors.
            As the defendant notes, both the text message and the social media posts predated the attack by months, and "typically, prior bad act evidence must share a relatively close temporal proximity to the charged crime" to be probative.  Commonwealth v. Facella, 478 Mass. 393, 405 (2017).  Yet "[t]here is no bright-line test for determining temporal remoteness of evidence of prior misconduct."  Id., quoting Commonwealth v. Helfant, 398 Mass. 214, 228 n.13 (1986).  And we have found analogous evidence probative for illustrating the history of the relationship between victim and defendant.  See, e.g., West, 487 Mass. at 805 & n.10 (vandalism by defendant about eight months before victim's death); Commonwealth v. Butler, 445 Mass. 568, 570, 575-576 (2005) (defendant's violence toward victim years earlier); Commonwealth v. Gil, 393 Mass. 204, 216-217 (1984) (restraining orders showing "continuing hostility between husband and wife seven months before the killings").  Here, although the text message and social media posts predated the attack by months, they were relevant to the conflicting testimony regarding the defendant's animus toward the alleged victims.
            As to whether this probative value was outweighed by the risk of unfair prejudice, we begin with the text message.  The defendant's only argument why the text message was unfairly prejudicial is that it "would suggest to the jury that [the defendant] had a violent intention against 'those in 65' (whoever that was)," and that "[t]his would lead them to view [the defendant] as someone with a propensity to commit the crimes alleged."  Contrary to this suggestion that the evidence impermissibly evinced hostility by the defendant toward individuals other than the victims, see, e.g., Commonwealth v. Anestal, 463 Mass. 655, 664-666 & n.15 (2012), the jury were entitled to infer that the text message's reference to "those in 65" directly referred to the victims (despite the fact that they actually resided in apartment sixty-six), as the text message also mentioned their first names, "miranda and nate."  The text message was thus probative of the proposition "that [the defendant] had a violent intention against" the victims in particular and posed little, if any, risk of unfair prejudice in the respect that the defendant claims.
            The defendant's argument with respect to the social media posts focuses on the posts' racial epithets.  Citing our decision in Commonwealth v. Chalue, 486 Mass. 847 (2021), the defendant argues that admitting this evidence was unduly prejudicial, where the Commonwealth did not pursue a theory that the defendant assaulted the victims because of racial animus toward them.  In Chalue, supra at 885, we held that the admission of a racial epithet was improper where it "implied that the murder was in some way racially motivated, despite the fact that the Commonwealth was not prosecuting the case on such a theory."
            Contrary to the crux of the defendant's argument, however, racial epithets are not per se inadmissible in cases not directly concerning race.  See Commonwealth v. Rodriguez, 101 Mass. App. Ct. 439, 447 (2022) (rejecting "categorical bar" of "evidence of a defendant's statement containing a racial epithet in any case that does not rest on a theory of racial animus").  Rather, whether a piece of evidence containing a racial epithet may be admitted is a fact-dependent inquiry.  See Sprint/United Mgt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008) ("Relevance and prejudice . . . are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad per se rules").  Racial epithets "pose[] a risk of inflaming a jury's emotions," Commonwealth v. Bishop, 461 Mass. 586, 596 (2012), or causing them to draw "inappropriate conclusions about [the defendant's] propensity toward criminality based on the language," Commonwealth v. Rosa, 468 Mass. 231, 241 (2014).  A judge must therefore be "convinced that the probative weight of such evidence justifies this risk."  Bishop, supra.  See, e.g., Rodriguez, supra at 446-448 (defendant's use of racial epithet in statement about killing probative because demonstrated defendant's knowledge of victim's race).
            The record here provides support for the trial judge's conclusion that the risk of unfair prejudice posed by the admission of the social media posts showing the defendant's use of a racial epithet was counterbalanced by the evidence's probative weight.  As discussed, the use of the epithet itself tended to show the defendant held animus against at least Cherniak, and the timing of the social media posts lent credence to the victims' testimony -- disputed by the defendant -- that the defendant made odd and threatening comments to or about them in approximately the same time period.  This evidence thus directly supported the Commonwealth's case regarding the defendant's intent and the Commonwealth's rebuttal of the defendant's self-defense theory.  Contrast Chalue, 486 Mass. at 848, 885 (any probative value of racial epithet made by codefendant was outweighed by risk of unfair prejudice where defendant alleged to have killed victim to prevent him from testifying in pending criminal cases).
            Moreover, the admission of the social media posts and text message did not risk overwhelming the case with evidence of prior bad acts by the defendant.  Contrast Commonwealth v. Dwyer, 448 Mass. 122, 128-129 (2006) (extensive evidence that defendant previously assaulted victim "[u]ncountable" number of times unfairly prejudicial where it "overwhelmed" case).  The prosecution redacted or omitted all other text messages and social media posts from the defendant's cell phone extraction report.  The admitted text message and two social media posts formed three discrete expressions of hostility by the defendant toward the victims illuminating their relationship, akin to the additional expressions of hostility described by the victims.[3]
            And the record leaves us confident that the trial judge carefully weighed this evidence's probative value against its risk of unfair prejudice.  See MacCormack, 491 Mass. at 863.  The judge duly acknowledged the risk of prejudice, excluding the evidence from the Commonwealth's case-in-chief and admitting it only after the defendant denied making any of the hostile statements the victims described.  The judge stated the appropriate standard, determining that the evidence's probative value was not outweighed by its prejudicial effect.  See Correia, 492 Mass. at 228-229.  In his words, the evidence was both "very prejudicial" and "very probative," and "not more prejudicial than probative, because it [was] so probative, given [the defendant's] testimony."
            Upon admitting this evidence of prior bad acts by the defendant, the better practice would have been for the trial judge to instruct the jury on the limited purposes for which they could consider it, thereby mitigating the risk of unfair prejudice.  See MacCormack, 491 Mass. at 863.  The defendant did not request a limiting instruction, however.  Having carefully considered the record as a whole, we cannot conclude that the judge abused his discretion in admitting this evidence, even in the absence of a limiting instruction.  See L.L., 470 Mass. at 185 n.27.
            b.  Exclusion of expert witness.  After the social media posts' admission, the defendant sought to introduce the testimony of an expert witness, Lindsay Hawk, in surrebuttal to challenge the evidence that the defendant authored the two social media posts.[4]  That evidence included a detective's testimony that the posts had been extracted from the defendant's cell phone, and that the defendant's cell phone had signed into both the social media account that made the posts and its associated e-mail account.  The detective also testified on cross-examination, however, that he could not determine based on the extraction report whether the defendant had made these two posts from his cell phone, and he agreed that anyone who knew the social media account's username and password could remotely log into the account from another device and make posts, which would appear on the defendant's cell phone after a brief delay.  The defendant, on cross-examination, denied that the social media account belonged to him.
            The trial judge excluded the expert testimony because Hawk had not been disclosed to the Commonwealth as a potential witness and because, the judge found, whoever authored the posts had some knowledge about the occupants of the apartment building at issue.  The defendant argues that exclusion of Hawk's testimony violated his constitutional right to present a defense.
            Article 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution "guarantee a criminal defendant the right to call witnesses to testify on his behalf."  Commonwealth v. Durning, 406 Mass. 485, 494-495 (1990).  This right is not "absolute," however, and "may be tempered" based on "legitimate demands of the adversarial system."  Id. at 495, quoting Commonwealth v. Edgerly, 372 Mass. 337, 343 (1977).
            The defendant does not dispute that he failed to disclose this expert witness in advance of trial in accordance with Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005).  Where a party fails to disclose a witness pretrial, a judge may order a remedy, "balanc[ing] the Commonwealth's interest in enforcing its procedural rules against the defendant's constitutional right to present evidence in his behalf."  Commonwealth v. Chappee, 397 Mass. 508, 517-518 (1986).  The judge must consider "(1) prevention of surprise; (2) evidence of bad faith in the violation of the conference report; (3) prejudice to the other party caused by the testimony; (4) the effectiveness of less severe sanctions; and (5) the materiality of the testimony to the outcome of the case."  Durning, 406 Mass. at 496.  We review a judge's decision to exclude a witness for an abuse of discretion.  See id. at 495.
            The record reflects that the trial judge considered each Durning factor.  The judge was particularly concerned with the prevention of surprise.  Although Hawk had been a witness at a motion hearing before the defendant's first trial, her testimony there concerned an entirely different subject; Hawk was not disclosed as a witness in advance of the second trial; and the Commonwealth had no notice of her testimony disputing the posts' authorship.  The Commonwealth also had not been provided with all the information upon which Hawk's proffered testimony relied.  For example, the defendant asserted Hawk would testify that the social media posts were made by a person named Luna, whose existence also had not been disclosed to the Commonwealth.  This exceedingly late disclosure at the time of surrebuttal would result in significant prejudice to the Commonwealth, which would be left with no time, unless requesting and being granted a continuance of the jury trial, to investigate Hawk's conclusions or identify Luna, a potential witness.  See Durning, 406 Mass. at 496-498 (rejecting art. 12 claim where defense's "definite intention" to call witness revealed to Commonwealth on last day of trial, and witness had been disclosed only one day before he would have testified).  Accordingly, the trial judge was warranted in finding that the late disclosure unfairly surprised and prejudiced the Commonwealth.
            Additionally, Hawk's testimony would have been minimally material to the case's outcome.  As discussed, the defendant, in cross-examining the detective who had extracted the posts from the defendant's cell phone, had successfully elicited that a person other than the defendant could have logged into the social media account from another device and made the posts, and the defendant in his own testimony had denied that the account belonged to him.  Thus, the possibility of a third-party author (albeit not "Luna" in particular) had already been established.  See Durning, 406 Mass. at 497-498 (judge warranted in excluding cumulative evidence).  Moreover, although the posts were relevant and probative evidence that the defendant had developed animus toward the victims in the months leading up to the incident, there was already additional evidence -- through the victims' testimony -- of other comments by the defendant evincing animus toward them during the same period, and there was extensive evidence regarding the circumstances of the incident itself bearing on the defendant's claim of self-defense.  The case's outcome thus did not hinge on the authorship of the posts.  Contrast Commonwealth v. Paiva, 71 Mass. App. Ct. 411, 415 (2008) (excluded evidence was "defendant's only realistic chance of acquittal").
            The trial judge also found evidence of purposeful conduct by defense counsel in the late disclosure.  Defense counsel argued that she had not foreseen the social media posts' admission as rebuttal evidence and therefore had not foreseen the need to call Hawk.  The judge rejected this explanation, citing the fact that this was the defendant's second trial.  Indeed, defense counsel had ample notice that the posts might be admitted and had even moved before trial to exclude this evidence, including on authenticity grounds.  And, when declining to allow the Commonwealth to introduce the posts in its case-in-chief, the judge never definitively excluded them but instead told counsel that he would reassess their admissibility, based on the posts' "significance" in evincing "obvious animosity" toward the victims, after the defendant's testimony.  All the while, defense counsel never disclosed the expert as a witness.  On the record before us, we cannot conclude that the trial judge erred in finding that the course of defense counsel's conduct provided some support for the remedy of exclusion.
            Finally, while "the preclusive sanction should be reserved for hard core transgressions" (quotation and citation omitted), Commonwealth v. Reynolds, 429 Mass. 388, 399 (1999), the trial judge did not abuse his discretion in ordering exclusion here.  This expert witness was first disclosed late in the trial, on surrebuttal; the defendant was indisputably on early and repeated notice of the Commonwealth's intent to introduce the social media posts, the authenticity of which was to be the focus of the expert witness's testimony; the late disclosure of the anticipated content of her testimony itself disclosed a potential additional witness whom the Commonwealth would need to investigate; and the expert testimony would have been only minimally material to the case's outcome.  Moreover, other sanctions could not fully mitigate the prejudice at this late stage of the trial.  For example, a written summary of the proposed expert testimony would not suffice, cf. Paiva, 71 Mass. App. Ct. at 416, because the Commonwealth would still need to investigate the alleged author of the social media posts, Luna.  "[T]he defendant could not fairly demand that the completion of the trial be delayed as long as might be necessary to permit the prosecutor[s] to master adequately the subject to be addressed by the [expert] witness[], to investigate [that] witness[], and to obtain appropriate rebuttal evidence."  Chappee, 397 Mass. at 518-519.
            In sum, while it would have been preferable for the trial judge to address each of the Durning factors explicitly, see Reynolds, 429 Mass. at 398, our evaluation of the record convinces us that the judge did appropriately balance the defendant's constitutional right to present a defense against the need to enforce procedural rules.  The trial judge did not abuse his discretion in deciding exclusion was the appropriate sanction, and we conclude that the exclusion of the expert witness did not violate the defendant's constitutional right to present a defense.
            3.  Conclusion.  The trial judge did not abuse his discretion in admitting evidence of prior bad acts by the defendant -- a text message containing a threat and two social media posts containing a racial epithet -- in rebuttal, where this evidence tended to prove the defendant's intent and disprove his claim of self-defense, and the defendant had denied making other contemporaneous statements to the victims evincing animus.  Nor did the trial judge abuse his discretion, once this evidence was admitted, in excluding testimony from a late-disclosed expert to dispute the social media posts' authorship.  The disclosure came on surrebuttal and, if allowed, would have prejudiced the Commonwealth; the defendant's self-defense theory did not hinge on the expert's testimony; and the defendant had been put on notice repeatedly before and during trial of the possible admission of the evidence that would have been the focus of the expert's testimony.  We therefore affirm the judgments.
So ordered.
footnotes

            [1] Cherniak denied the tattoo was of "211," asserting that it was a poorly drawn "M" for (Miranda) Arthur-Smith and his dog, May.
            [2] One of the police officers who responded to the scene, about fifteen minutes after hearing the dispatch, testified that he did not observe or smell any remnants of pepper spray inside the hallway of the apartment building.
            [3] We also note that the evidence of prior bad acts at issue here -- statements by the defendant -- were not "so similar to the charged offense that [they] increased 'the risk of propensity reasoning by the jury.'"  MacCormack, 491 Mass. at 863, quoting Commonwealth v. Da Lin Huang, 489 Mass. 162, 174 (2022).  Contrast Dwyer, 448 Mass. at 128-129 (prior bad acts same as charged offenses).
            [4] On appeal, the defendant does not argue error in the social media posts' admission for lack of authentication, and we do not reach that issue.